# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:                                                          Case No.: 25-24568

BANCO MASTER, S.A., BANCO                      Chapter 15
LETSBANK, S.A., BANCO MASTER DE
INVESTIMENTO, S.A., and MASTER S/A
CORRETORA DE CÂMBIO, TÍTULOS E
VALORES MOBILIÁRIOS,

_____Debtor in a Foreign Proceeding._____/

**DECLARATION OF HENRIQUE FORSSELL IN SUPPORT
OF RESPONSE TO DANIEL VORCARO'S OBJECTION TO
THE LIQUIDATOR'S MOTION FOR ORDER GRANTING
RECOGNITION OF FOREIGN MAIN PROCEEDING**

I, Henrique Forssell, under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746, and

duly authorized, declare the following:

1.      I am a Partner with the law firm of Duarte e Forssell Sociedade de Advogados

("DFA"), located at Alameda Santos 2326, 4th and 10th floors, CEP 01418-200, Sao Paulo, Brazil,

a Brazilian law firm specialized in international asset recovery, international fraud investigations,

and cross-border insolvency cases.  I am counsel in Brazil to the extrajudicial liquidator of Banco

Master, S.A., Banco LetsBank, S.A., Banco Master de Investimentos, S.A., and Master S/A

Corretora de Câmbio, Títulos e Valores Mobiliários (the "Debtors").

2.      I can read and understand English and make this Declaration without the aid of a

translator but, as English is not my native language, if called upon to testify, I could testify as to

all matters set forth in this Declaration with the aid of a translator.

3.      I am providing this Declaration in support of the *Response to Daniel Vorcaro's*

*Objection to the Liquidator's Motion for Order Granting Recognition of Foreign Main Proceeding*

1

*Pursuant to 11 U.S.C. §§ 1515 & 1517 of the Bankruptcy Code and Related Relief* filed by EFB Regimes Especiais de Empresas, Ltda., represented by Eduardo Felix Bianchini, as extrajudicial liquidator (the "<u>Foreign Representative</u>" or the "<u>Liquidator</u>").

4.      The extrajudicial liquidation of financial institutions in Brazil is governed by Law No. 6,024, dated March 13, 1974.

5.      The statute assigns the Brazilian Central Bank a supervisory role over the Debtors' liquidation and the Liquidator's acts, including through administrative review mechanisms. Key decisions taken during the liquidation – including those affecting creditor claims, asset realization, and distribution – remain subject to the Central Bank's administrative review and control.

6.      For example, Article 30 provides (as a general rule) for administrative appeals against the Liquidator's decisions to be taken to the Central Bank, without suspensive effect, within the statutory timeframe. Furthermore, Article 33 requires the Liquidator to report and render accounts to the Central Bank whenever he leaves office or whenever requested.

7.      This supervisory framework reflects the statute's core design: extrajudicial liquidation is an administrative proceeding under the Central Bank's authority, not a judicial insolvency case managed by a court-appointed trustee. The Central Bank's role encompasses initiating the regime, appointing and overseeing the Liquidator and supervising the execution of liquidation acts.

8.      Article 34 expressly draws an analogy to the bankruptcy framework for certain purposes, including by aligning the Liquidator with the role performed by a trustee in a judicial insolvency proceeding and positioning the Central Bank in the supervisory/judicial-equivalent role contemplated by the statute.

9.      Nevertheless, the Liquidator's acts are ultimately subject to judicial review under Article 5, XXXV of the Brazilian Constitution (i.e. access to the Judiciary for any injury or threat to a right). This is a general constitutional safeguard applicable to administrative acts broadly (including administrative acts by the Central Bank); it does not replace or convert the Central Bank's statutory supervision into "judicial review," nor does it shift supervision of the liquidation from the Central Bank to the state courts.

10.     Administrative acts relating to the extrajudicial liquidation may fall within the jurisdiction of Brazil's state or federal courts, depending on the respondent and the relief sought.

11.     As a practical matter, challenges directed at the Central Bank (including those that seek to affect the liquidation decree itself or the legality of Central Bank decisions) fall under the jurisdiction of the Federal Courts pursuant to Article 109, I of the Federal Constitution (because the Central Bank is a federal autonomous entity). Also, because the Liquidator acts as an agent of the Central Bank within this regime, there are judicial precedents to the effect that challenges to certain Liquidator acts may also be heard by the Federal Courts when framed as actions against the Central Bank/its agent.

12.     The statute also contemplates that, after an administrative appeal is resolved, creditors may continue (or resume) certain judicial actions that had been stayed – typically state-court proceedings aimed at determining/liquidating the amount of the credit (i.e., claim-quantification disputes), rather than substituting the courts for the Central Bank's supervisory role over the liquidation.

13.     With regard to the *Tribunal de Contas da União* or TCU ("Federal Court of Accounts"), this is Brazil's federal audit institution that supports Congress' external oversight of the use of federal public funds and related accountability matters. Its organization and functions

3

are set out in Articles 70 to 75 of the Brazilian Constitution and in Law No. 8,443, dated July 16, 1992.

14.     TCU's core mission is to audit and inspect the accounting, financial, budgetary, operational, and asset management of the Union and of federal entities (direct and indirect administration), assessing legality, legitimacy, and economy/efficiency, including the use of subsidies, tax expenditures/waivers, and any federal public resources transferred to third parties.

15.     In view of that, it is at least highly questionable whether the TCU would have authority to revoke or overturn a Central Bank decision decreeing extrajudicial liquidation. I am not aware of any precedent in which the TCU has purported to annul such a Central Bank decree. In my view, this is consistent with the allocation of competencies: the decision to place an institution under a special resolution regime is a prudential/regulatory measure within the Central Bank's discretionary remit, and the TCU's external control is generally directed to the regularity and legality of the decision-making process rather than substituting its judgment for the Central Bank's prudential merits assessment. In other words, even assuming that the TCU may scrutinize the decision-making process (from an external-control perspective), it is not a body that "replaces" the Central Bank's prudential/regulatory discretion.

16.     The reporting minister's recent order in the TCU proceedings no. 022.950/2025-7, dated 5 January 2025, which was made public through an online news source[1] and a machine-translated version of which is attached hereto at **Exhibit "A"**, appears to confirm this premise. The order expressly noted that it is not for the TCU to substitute itself for the Central Bank's convenience/opportunity (merits) assessment; rather, its review is directed to process regularity and legal/principled compliance (for example, legality, reasoning, proportionality, reasonableness,

---

[1] *See* https://www.poder360.com.br/poder-economia/tribunal-de-contas-ameaca-bc-com-medida-cautelar/

and consideration of alternatives). The order is also preliminary in nature (geared to information-gathering and potential interim measures) and remains subject to further deliberation within the Court.

17.     In the same sense, in a recent interview published in the *Valor Econômico* portal,[2] Lucas Rocha Furtado, member of the Public Prosecutor's Office who initiated the proceedings at the TCU, states that there was no request on his part "to reverse the extrajudicial liquidation or interfere" in the process related to Banco Master. According to him, his intention is only "to verify whether an untimely performance in relation to the Master could have contaminated the financial market, as well as whether someone may have profited from any previous omissions by the Central Bank."

18.     Separately, and for the same reasons discussed above, it is also highly questionable whether the TCU can impose "precautionary measures" limiting the powers of the Liquidator. These powers result from the application of the Law 6,024. To the extent any measure were attempted that effectively curtailed the Liquidator's statutory powers under Law 6,024/1974, that would itself be subject to judicial review.

19.     Notably, no portion of any order entered by the TCU imposes any such measure or limits the effect of the Debtors' ongoing liquidation in any way.

*[Remainder of page intentionally left blank.]*

---

[2] A true and correct copy of the referenced article, together with a machine translation of relevant portions thereof, is attached as **Exhibit "B"** hereto.

I, Henrique Forssell, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated this 7 January 2025.


_____
Henrique Forssell

# EXHIBIT A

**TCU** **FEDERAL COURT OF ACCOUNTS**
Office of Minister Jhonatan de Jesus

 

> **Case: 022.950/2025-7 Nature:** Representation
> **Body/Entity:** Central Bank of Brazil
> **Responsible(s):** Identity preserved (article 55, caput, of Law No. 8,443/1992)
> **Interested party:** Identity preserved (art. 55, caput, of Law No. 8,443/1992)

 

### ORDER

 

This is a representation made by the Public Prosecutor's Office before the TCU (parts 1 and 2), based on article 81 of Law 8,443/1992, in which evidence of failures in the supervision exercised by the Central Bank of Brazil (BCB) over Banco Master S.A. and its subsidiaries is raised, culminating in the decree of its extrajudicial liquidation, on 11/18/2025. The ministerial body maintains that the BCB's performance may have been marked by omissions and insufficient timely reaction to signs of financial degradation of the institution, with potential compromise of the effectiveness of the regulatory framework and expansion of systemic risk.

2.        The representation highlights that the liquidation of an institution with relevant capillarity and significant liabilities can produce chain effects on agents of the National Financial System, with impacts on creditors, investors and depositors, and with possible significant pressure on the Credit Guarantee Fund (FGC). In this line, it also emphasizes the institutional duty of the BCB to act with technical rigor, predictability and adherence to the normative rite, in order to preserve confidence in the banking supervision and resolution regime.

3.        Considering the dynamics of the special regime and the need to form a conviction based on consistent elements, a hearing of the BCB was held for detailed clarifications, with pertinent documentation, observing the precautions of legal secrecy, especially regarding (i) the grounds and motivation for the enactment of the regime, (ii) the evaluation of less onerous alternatives, (iii) the negotiations and chronology,  and (iv) decision-making governance and internal coherence. The BCB responded by means of a Technical Note, setting out the chronology, grounds and considerations regarding risks associated with measures that suspend or restrict, in a broad way, acts inherent to the course of the regime, including from the perspective of danger in reverse delay. **I emphasize, however, that the Technical Note presented was limited, in essence, to the summary exposition of chronology and grounds**, with reference to internal processes and records, **without being accompanied, on this occasion, by the underlying documentary collection** (documents, internal notes, opinions and deliberation records) necessary for the objective verification of the assertions contained therein.

4.        In summary, the BCB maintains that the liquidation would not have been an isolated or hasty act, but the outcome of the supervisory process, considering it inevitable in the face of a liquidity crisis, relevant regulatory non-compliance and findings of irregularities in operations, with reference to the corresponding legal bases. It also points out that Law 6,024/1974 structures the regime and assigns powers to the supervisory authority



**FEDERAL COURT OF ACCOUNTS**
Office of Minister Jhonatan de Jesus

(including the designation of the liquidator and the discipline of acts subject to authorization), so that broad external interventions may affect the regular conduct of the liquidation and the fulfillment of the public interest underlying the institute.

5.        Subsequently, **the records were forwarded to AudBancos, a** specialized technical unit, for analysis and proposal for forwarding. **The instruction presented records that the proper appreciation of the regularity of the decision-making process requires direct access, in a controlled environment and with confidentiality precautions, to essential internal documents and records, which is why it proposes the <u>performance of inspection</u> as a central investigative measure**, including for the reconstruction of the decision-making process and assessment of motivation, coherence and proportionality.

6.        It should be noted, from the outset, that it is not up to this Court to replace the Central Bank of Brazil in the prudential-regulatory judgment on the merits, nor to impose a certain regulatory solution, reassessing the convenience and timeliness of the measure adopted. The external control, in this case, focuses on the regularity of the decision-making process, with verification, in the light of the applicable rules, of compliance with the principles of legality, motivation, proportionality, reasonableness, internal coherence and the documented consideration of alternatives provided for in the relevant normative framework, especially when the decision has the potential for systemic repercussion and relevant impact on creditors and instruments for the protection of the system. Without prejudice to this, and precisely to preserve the usefulness of this control, the possibility remains, in theory, that it may be necessary, at an opportune moment and based on objective elements, the assessment of measures of an assuring and strictly finalistic nature, aimed at avoiding effects that are difficult to reverse while convincing is formed with the support of primary documentation,  without anticipation of a conclusive judgment as to the prudential merit of the regulatory decision.

7.        That said, the joint reading of the BCB's response and AudBancos' examination highlights points that, although they do not authorize early conclusion, justify an objective direction of the inspection with a focus on original and traceable documentation (processes, successive versions, internal notes, opinions, legal manifestations, processing records, meeting memories and collegiate deliberation). The technical unit points out relevant milestones in the 2024–2025 period related to the monitoring of liquidity risk, the communication of potential preventive prudential measures, the formalization of interest by a public financial institution, the drafting of a formal term of attendance and the participation of the FGC in private solutions and liquidity assistance. **This is also necessary because the central points stated in the Technical Note** – although relevant as an institutional narrative – **were not accompanied by documentary evidence in the records**.

8.        Added to this picture is an element that, although it should be treated with methodological caution, is relevant for the proper formulation of the scope of the inspection: there is, in public records and in journalistic articles widely disseminated in the market, reference to the accelerated growth of Banco Master from 2019 onwards, associated with an aggressive funding strategy — notably through CDBs offered with remuneration significantly higher than those practiced by comparable institutions and with intense distribution on platforms. Although such records do not replace evidential elements, they are connected to the BCB's own report, in the Technical Note, according to which there was atypical growth in the 2019–2024 period and the relevance of funding by debt instruments distributed on platforms. From this perspective, without any conclusive judgment, it is important that the inspection reconstructs, with original documentation and sufficient traceability, whether and to what extent prudential signs of this


**FEDERAL COURT OF ACCOUNTS**
Office of Minister Jhonatan de Jesus

funding *model* were internalized and addressed in the supervisory cycles prior to 2024, which measures were effectively adopted between 2019 and 2023 (including escalation, restrictions, requirements, and monitoring), and whether the supervisory response, in this interval, was timely and proportional to the level of risk then identified.

9.		In this context, the following stand out as materially relevant checkpoints deserving of detailed document reconstruction: (i) the temporal evolution of alerts and supervisory measures in the face of signs of degradation (including prudential escalation and responses to non-compliance); (ii) the treatment given to market alternatives and the hypothesis of "organized exit", including negotiations with the participation of the FGC; (iii) the consistency and completeness of the evaluation of initiatives involving potential acquirers and corporate reorganizations; (iv) internal governance and the possible existence of alternative technical positions or relevant reservations in the decision-making flow; and (v) the technical and isonomic examination of supervening proposals presented in a critical time window.

10.		In the BRB/internal governance axis, the Technical Note maintains that there are no relevant internal divergences and records a final collegiate deliberation. Without prejudice to the fact that collegiate deliberations are, in the end, unanimous, journalistic articles reported the existence of different internal positions regarding the market solution involving BRB, with mentions to the performance of certain directors at different times in the monitoring of the case. The verification of this point is relevant because it dialogues directly with the allegation of absence of internal divergence contained in the Technical Note and with the duty to face alternatives with motivation. This apparent tension recommends that the inspection reconstruct the decision-making process with original documentation, allowing to assess: (i) whether there were, in fact, alternative technical positions or relevant reservations; (ii) how they were processed and overcome; and (iii) whether the final motivation sufficiently addressed contrary elements and less onerous alternatives.

11.		In the FGC/organized exit axis, the BCB's response describes the recognition of a special situation that would have given rise to financial assistance of liquidity by the FGC, with disbursements and extensions, while mentioning funding difficulties and other milestones in the period. The inspection must seek, with a documentary trail, (i) how and when a less onerous alternative was evaluated; (ii) what conditions were set and monitored; (iii) which milestones indicated exhaustion (or unfeasibility) of private solutions; and (iv) to what extent the option for liquidation was compatible with the expected prudential staggering, in light of the applicable normative rite and the elements contemporaneous with the process.

12.		In the axis of the critical window 17–18/11/2025, the BCB's response records a meeting/videoconference on 11/17/2025 and indicates that the initiatives presented would not have been accompanied, at that time, by sufficient documentation to allow for an adequate prudential assessment; It also mentions the initiation of an electronic proceeding on 11/18/2025 related to requests dated 11/17/2025, with an indication of instructive insufficiency and subsequent filing on 12/19/2025 after formal withdrawal.

13.		This chain, precisely because it is temporally concentrated and because it is related to the market alternative presented on the eve of the decree of the regime, demands especially careful and documented examination. Added to this is the existence of elements contained in documents attached to the case file and in public records that indicate the need to determine whether supervening private proposals — including those attributed to Grupo Fictor in some documents — were submitted to a complete, timely and formally motivated prudential evaluation, or whether their treatment may have been influenced by a sensitive temporal context marked by supervening facts of a different nature.



**FEDERAL COURT OF ACCOUNTS**
Office of Minister Jhonatan de Jesus

criminal. In this line, it is necessary to verify, based on primary documentation and with sufficient traceability, the adequate segregation between factors exogenous to the decision-making process and the duty of technical examination of the market solutions presented, with reconstruction of deadlines, requirements, instances involved, manifestations produced and determining grounds.

14.        In addition to the above points, I consider it necessary for the inspection to contemplate, in an express and verifiable manner, some specific aspects that are relevant to the clarification of the case, without prejudice to others that the technical unit deems pertinent: (i) the examination of the conglomerate's prudential supervision history, with access to the internal electronic file PE No. 285696 and the related records that document the follow-up,  the risk reclassification milestones, the requirements and responses, as well as any restrictive measures and their monitoring;
(ii) the verification of the reasons and criteria adopted regarding the initiation (or not) of administrative sanctioning proceedings and other *enforcement* measures, especially when there is communication of evidence to prosecution bodies; (iii) obtaining and analyzing the content and formal records of the meeting/videoconference of 11/17/2025 (call, agenda, participants, minutes/memory, documents presented and subsequent requirements);
(iv) the reconstruction and examination of the process initiated on 11/18/2025 regarding requests dated 11/17/2025, with identification of the flow, the requirements, the technical and legal instances involved and the determining grounds;
(v) the technical motivation and procedural adherence of decisions related to the transfer of control and corporate reorganizations (including as to the requirements of instruction and deliberative governance), in light of the applicable regulations;  and
(vi) the grounds for adopting (or not) intermediate measures provided for in the legal framework, when applicable, before the decree of the extreme regime.

15.        Also noteworthy, as a systemic background, is the conglomerate's capillarity profile and its performance across multiple segments, as well as the information, contained in the BCB's Technical Note and reflected in the instruction of the technical unit, about difficulties in raising funds from institutional investors as of November 2024, in a context in which the group also operated through investment vehicles/funds. Without categorical statements, the inspection may map, when pertinent and under confidentiality, whether there are relevant exposures of institutional investors — including indirect ones, through vehicles/funds — and whether there are assets or strategic structures whose fractionation, encumbrance or disaggregation, in the course of the regime, may lead to destruction of value and reduce the reversibility of solutions, with potential influence on the analysis of the preservation of alternatives.

16.        It is inherent to the extrajudicial liquidation regime the practice of acts with the potential to be difficult to reverse, notably those related to the sale, encumbrance, transfer or demobilization of relevant assets. The consummation of structural acts of patrimonial disposition may reduce the usefulness of any final pronouncement of the Court on the merits, if relevant flaws are identified in the decision-making process or in the treatment of alternatives. At the same time, I recognize that indiscriminate measures that make the minimum functioning of the regime unfeasible may produce danger in reverse delay, with impacts on creditors, depositors and resolution costs, especially with repercussions on the FGC. This tension recommends caution, adequate instruction and eventual strictly finalistic calibration.

17.        For these reasons, it is not appropriate to anticipate a conclusive judgment on whether or not the conditions for a possible precautionary measure are met (or not) before the inspection begins and sufficient primary elements are gathered. This, however, does not elide



**FEDERAL COURT OF ACCOUNTS**
Office of Minister Jhonatan de Jesus

the nature of a warning: in view of the risk of potentially irreversible acts, it is not ruled out that a precautionary measure addressed to the Central Bank of Brazil, of an assuring nature and with strictly finalistic and proportional contours, aimed at preserving the value of the liquidating estate and the usefulness of external control, may be considered at an appropriate time,  provided that it is supported by objective elements, with express motivation and specific consideration as to the danger in reverse delay.

18.       In view of the above, **accepting the proposal formulated by the specialized technical unit, and based on article 240 of the TCU's Internal Regulations, I determine, with the utmost urgency, the carrying out of an inspection at the Central Bank of Brazil**, for *on-site  examination* of the necessary collection, in a secure environment and under the precautions of legal secrecy, with a view to rebuilding the flow of supervision and resolution in the period 2019-2025, verify motivation, coherence and proportionality, examine the consideration of less onerous alternatives and assess, with documentary traceability, the treatment given to relevant market dealings, including those presented in a window immediately prior to the enactment of the regime, without prejudice to other points that the team deems pertinent in the planning, with the usual precautions.

19.       In order to carry out the inspection, AudBancos must adopt measures compatible with the points of attention identified in the body of this order, notably: ensure full access to the relevant internal processes and records (with emphasis on PE No. 285696 and related); obtain and examine successive versions of technical and legal statements and consolidation records; collect and analyze the formal records of the meeting/videoconference of 11/17/2025 and the process initiated in 18/11/2025; reconstruct chronology and documentation of negotiations involving private solutions with the participation of the FGC and initiatives related to potential acquirers and reorganizations; examine internal decision-making governance (instances, flows, records of deliberation); and, when pertinent to systemic risk, map relevant exposures to institutional investors. It must also, based on evidentiary content, reconstruct and document, in the period 2019–2023, the evolution of the *funding   model* and the conglomerate's funding profile (including instruments distributed on platforms), the existence of correlated internal alerts, and the escalation of supervisory actions adopted in view of this situation, allowing for the assessment of timeliness, proportionality, and sufficiency of prudential measures in the interval. The work must be conducted with sufficient traceability to allow the reconstitution of the decision-making flow and the coherence test of the premises set forth in the Technical Note, without prejudice to further deliberation

20.       Finally, I accept the grounds of the unit to reject the request for admission as an interested party made by the Social Security Institute of Itaguaí (part 22), for not demonstrating a legitimate reason to intervene in the fact. Furthermore, in view of the existence of a case pending before the Federal Supreme Court with a related issue, I hereby inform the President of that Court and the Honorable Justice Dias Toffoli, rapporteur of Constitutional Complaint No. 88,121/DF, for the purposes of knowledge and possible prevention in future related facts.

The records are forwarded to the technical unit.


(*Electronically signed*) MINISTER

JHONATAN DE JESUS
Rapporteur

**TRIBUNAL DE CONTAS DA UNIÃO**
Gabinete do Ministro Jhonatan de Jesus

**Processo: 022.950/2025-7**
**Natureza:** Representação
**Órgão/Entidade:** Banco Central do Brasil
**Responsável(eis):** Identidade preservada (art. 55, caput, da Lei n. 8.443/1992)
**Interessado(os):** Identidade preservada (art. 55, caput, da Lei n. 8.443/1992)


# DESPACHO


Cuida-se de representação formulada pelo Ministério Público junto ao TCU (peças 1 e 2), com fundamento no art. 81 da Lei 8.443/1992, na qual se suscitam indícios de falhas na supervisão exercida pelo Banco Central do Brasil (BCB) sobre o Banco Master S.A. e suas controladas, culminando na decretação de sua liquidação extrajudicial, em 18/11/2025. Sustenta o órgão ministerial que a atuação do BCB pode ter sido marcada por omissões e insuficiência de reação tempestiva a sinais de degradação financeira da instituição, com potencial comprometimento da eficácia do marco regulatório e ampliação de risco sistêmico.

2.        A representação destaca que a liquidação de instituição com capilaridade relevante e passivos expressivos pode produzir efeitos em cadeia sobre agentes do Sistema Financeiro Nacional, com impactos sobre credores, investidores e depositantes, e com possível pressão significativa sobre o Fundo Garantidor de Créditos (FGC). Nessa linha, também enfatiza o dever institucional do BCB de atuar com rigor técnico, previsibilidade e aderência ao rito normativo, de modo a preservar a confiança no regime de supervisão e de resolução bancária.

3.        Considerando a dinâmica própria do regime especial e a necessidade de formação de convencimento a partir de elementos consistentes, foi promovida oitiva do BCB para esclarecimentos circunstanciados, com documentação pertinente, observadas as cautelas de sigilo legal, em especial quanto à (i) fundamentação e motivação da decretação do regime, (ii) avaliação de alternativas menos gravosas, (iii) tratativas e cronologia, e (iv) governança decisória e coerência interna. O BCB respondeu por meio de Nota Técnica, expondo cronologia, fundamentos e considerações quanto a riscos associados a medidas que suspendam ou restrinjam, de modo amplo, atos inerentes ao curso do regime, inclusive sob a perspectiva de perigo na demora reverso. **Ressalto, contudo, que a Nota Técnica apresentada se limitou, em essência, à exposição sintética de cronologia e fundamentos**, com remissão a processos e registros internos, **sem que viesse acompanhada, nesta oportunidade, do acervo documental subjacente** (peças, notas internas, pareceres e registros de deliberação) necessário à verificação objetiva das assertivas nela contidas.

4.        Em síntese, o BCB sustenta que a liquidação não teria sido ato isolado ou precipitado, mas desfecho de processo de supervisão, reputando-se inevitável diante de crise de liquidez, descumprimentos normativos relevantes e achados de irregularidades em operações, com remissão às bases legais correspondentes. Assinala, ainda, que a Lei 6.024/1974 estrutura o regime e atribui à autoridade supervisora competências



**TRIBUNAL DE CONTAS DA UNIÃO**
Gabinete do Ministro Jhonatan de Jesus

essenciais (inclusive quanto à designação do liquidante e à disciplina de atos sujeitos a autorização), de modo que intervenções externas amplas podem afetar a condução regular da liquidação e o atendimento do interesse público subjacente ao instituto.

5.          Na sequência, **os autos foram encaminhados à AudBancos**, unidade técnica especializada, para análise e proposta de encaminhamento. **A instrução apresentada registra que a adequada apreciação da regularidade do processo decisório demanda acesso direto, em ambiente controlado e com cautelas de sigilo, a documentos e registros internos essenciais, razão pela qual propõe** <u>realização de inspeção</u> **como providência instrutória central**, inclusive para reconstrução do iter decisório e aferição de motivação, coerência e proporcionalidade.

6.          Cumpre registrar, desde logo, que não compete a esta Corte substituir o Banco Central do Brasil no juízo prudencial-regulatório de mérito, nem impor determinada solução regulatória, reavaliando conveniência e oportunidade da medida adotada. O controle externo, no caso, incide sobre a regularidade do processo decisório, com verificação, à luz das normas aplicáveis, da observância dos princípios da legalidade, motivação, proporcionalidade, razoabilidade, coerência interna e da consideração documentada de alternativas previstas no arcabouço normativo pertinente, especialmente quando a decisão possui potencial de repercussão sistêmica e de impacto relevante sobre credores e instrumentos de proteção do sistema. Sem prejuízo disso, e precisamente para preservar a utilidade desse controle, permanece, em tese, resguardada a possibilidade de que se mostre necessária, em momento oportuno e com base em elementos objetivos, a apreciação de providências de natureza assecuratória e estritamente finalística, voltadas a evitar efeitos de difícil reversão enquanto se forma convencimento com suporte em documentação primária, sem antecipação de juízo conclusivo quanto ao mérito prudencial da decisão regulatória.

7.          Dito isso, a leitura conjunta da resposta do BCB e do exame da AudBancos evidencia pontos que, embora não autorizem conclusão antecipada, justificam direcionamento objetivo da inspeção com foco em documentação originária e rastreável (processos, versões sucessivas, notas internas, pareceres, manifestações jurídicas, registros de tramitação, memórias de reunião e deliberação colegiada). A unidade técnica aponta marcos relevantes no período 2024–2025 relativos ao acompanhamento de risco de liquidez, à comunicação de potenciais medidas prudenciais preventivas, à formalização de interesse por instituição financeira pública, à lavratura de termo formal de comparecimento e à participação do FGC em soluções privadas e assistência de liquidez. **Isso se impõe, inclusive, porque os pontos centrais afirmados na Nota Técnica** – embora relevantes como narrativa institucional – **não foram acompanhados de prova documental nos autos**.

8.          Soma-se a esse quadro um elemento que, embora deva ser tratado com cautela metodológica, é relevante para a adequada formulação do escopo da inspeção: há, em registros públicos e em matérias jornalísticas amplamente difundidas no mercado, referência a crescimento acelerado do Banco Master a partir de 2019, associado a estratégia de captação agressiva — notadamente por meio de CDBs ofertados com remunerações significativamente superiores às praticadas por instituições comparáveis e com intensa distribuição em plataformas. Ainda que tais registros não substituam elementos probatórios, eles se conectam ao próprio relato do BCB, na Nota Técnica, segundo o qual houve crescimento atípico no período 2019–2024 e a relevância de captação por instrumentos de dívida distribuídos em plataformas. Nessa perspectiva, sem qualquer juízo conclusivo, é importante que a inspeção reconstrua, com documentação originária e rastreabilidade suficiente, se e em que medida sinais prudenciais desse



**TRIBUNAL DE CONTAS DA UNIÃO**
Gabinete do Ministro Jhonatan de Jesus

modelo de *funding* foram internalizados e tratados nos ciclos supervisores anteriores a 2024, quais medidas foram efetivamente adotadas entre 2019 e 2023 (inclusive escalonamento, restrições, exigências e monitoramento), e se a resposta supervisora, nesse intervalo, foi tempestiva e proporcional ao nível de risco então identificado.

9.          Nesse contexto, sobressaem como pontos de verificação materialmente relevantes e merecedores de reconstrução documental minuciosa: (i) a evolução temporal de alertas e medidas de supervisão frente a sinais de degradação (incluindo escalonamento prudencial e respostas a descumprimentos); (ii) o tratamento conferido a alternativas de mercado e à hipótese de "saída organizada", inclusive tratativas com participação do FGC; (iii) a consistência e completude da avaliação de iniciativas envolvendo potenciais adquirentes e reorganizações societárias; (iv) a governança interna e eventual existência de posições técnicas alternativas ou ressalvas relevantes no fluxo decisório; e (v) o exame técnico e isonômico de propostas supervenientes apresentadas em janela temporal crítica.

10.        No eixo BRB/governança interna, a Nota Técnica sustenta inexistirem divergências internas relevantes e registra deliberação final colegiada. Sem prejuízo de que deliberações colegiadas sejam, ao final, unânimes, matérias jornalísticas noticiaram a existência de posições internas distintas quanto à solução de mercado envolvendo o BRB, com menções à atuação de determinados diretores em momentos diversos do acompanhamento do caso. A verificação desse ponto é relevante porque dialoga diretamente com a alegação de ausência de divergência interna constante da Nota Técnica e com o dever de enfrentamento motivado de alternativas. Essa aparente tensão recomenda que a inspeção reconstrua o *iter* decisório com documentação originária, permitindo aferir: (i) se houve, de fato, posições técnicas alternativas ou ressalvas relevantes; (ii) como foram processadas e superadas; e (iii) se a motivação final enfrentou, de modo suficiente, elementos contrários e alternativas menos gravosas.

11.        No eixo FGC/saída organizada, a resposta do BCB descreve o reconhecimento de situação especial que teria ensejado assistência financeira de liquidez pelo FGC, com desembolsos e prorrogações, ao mesmo tempo em que se mencionam dificuldades de captação e outros marcos do período. A inspeção deve buscar, com trilha documental, (i) como e quando se avaliou alternativa menos gravosa; (ii) quais condicionantes foram fixadas e monitoradas; (iii) quais marcos indicaram esgotamento (ou inviabilidade) das soluções privadas; e (iv) em que medida a opção pela liquidação se apresentou como compatível com o escalonamento prudencial esperado, à luz do rito normativo aplicável e dos elementos contemporâneos ao processo.

12.        No eixo da janela crítica 17–18/11/2025, a resposta do BCB registra reunião/videoconferência em 17/11/2025 e indica que as iniciativas apresentadas não teriam sido acompanhadas, naquele momento, de documentação suficiente para permitir avaliação prudencial adequada; menciona, ainda, a instauração de processo eletrônico em 18/11/2025 relativo a requerimentos datados de 17/11/2025, com indicação de insuficiência instrutória e posterior arquivamento em 19/12/2025 após desistência formal.

13.        Esse encadeamento, exatamente por ser concentrado temporalmente e por se relacionar a alternativa de mercado apresentada às vésperas da decretação do regime, demanda exame especialmente cuidadoso e documentado. Soma-se a isso a existência de elementos constantes de peças juntadas aos autos e de registros públicos que indicam a necessidade de apurar se propostas privadas supervenientes — inclusive as atribuídas ao Grupo Fictor em alguns documentos — foram submetidas a avaliação prudencial completa, tempestiva e formalmente motivada, ou se o seu tratamento pode ter sido influenciado por contexto temporal sensível marcado por fatos supervenientes de natureza



**TRIBUNAL DE CONTAS DA UNIÃO**
Gabinete do Ministro Jhonatan de Jesus

criminal. Nessa linha, impõe-se verificar, com base em documentação primária e com rastreabilidade suficiente, a adequada segregação entre fatores exógenos ao processo decisório e o dever de exame técnico das soluções de mercado apresentadas, com reconstrução de prazos, exigências, instâncias envolvidas, manifestações produzidas e fundamentos determinantes.

14.         A par dos pontos acima, reputo necessário que a inspeção contemple, de forma expressa e verificável, alguns aspectos específicos que se mostram relevantes para o esclarecimento do caso, sem prejuízo de outros que a unidade técnica entenda pertinentes: (i) o exame do histórico da supervisão prudencial do conglomerado, com acesso ao processo eletrônico interno PE nº 285696 e aos autos correlatos que documentem o acompanhamento, os marcos de reclassificação de risco, as exigências e as respostas, bem como eventuais medidas restritivas e seu monitoramento; (ii) a verificação das razões e critérios adotados quanto à instauração (ou não) de processo administrativo sancionador e outras providências de *enforcement*, especialmente quando houver comunicação de indícios a órgãos de persecução; (iii) a obtenção e análise do teor e registros formais da reunião/videoconferência de 17/11/2025 (convocação, pauta, participantes, ata/memória, documentos apresentados e exigências posteriores); (iv) a reconstrução e o exame do processo instaurado em 18/11/2025 relativo a requerimentos datados de 17/11/2025, com identificação do fluxo, das exigências, das instâncias técnicas e jurídicas envolvidas e dos fundamentos determinantes; (v) a motivação técnica e a aderência procedimental de decisões relacionadas a transferência de controle e reorganizações societárias (inclusive quanto a requisitos de instrução e governança deliberativa), à luz da regulamentação aplicável; e (vi) os fundamentos para adoção (ou não) de medidas intermediárias previstas no arcabouço legal, quando cabíveis, antes da decretação do regime extremo.

15.         Também merece atenção, como pano de fundo sistêmico, o perfil de capilaridade do conglomerado e sua atuação por múltiplos segmentos, bem como a informação, constante da Nota Técnica do BCB e repercutida na instrução da unidade técnica, acerca de dificuldades de captação junto a investidores institucionais a partir de novembro de 2024, em contexto no qual o grupo também atuava por meio de veículos/fundos de investimento. Sem afirmações categóricas, a inspeção poderá mapear, quando pertinente e sob sigilo, se existem exposições relevantes de investidores institucionais — inclusive indiretas, por meio de veículos/fundos — e se há ativos ou estruturas estratégicas cujo fracionamento, oneração ou desagregação, no curso do regime, possa acarretar destruição de valor e reduzir a reversibilidade de soluções, com potencial influência na análise sobre preservação de alternativas.

16.         É inerente ao regime de liquidação extrajudicial a prática de atos com potencial de difícil reversão, notadamente os relacionados a alienação, oneração, transferência ou desmobilização de ativos relevantes. A consumação de atos estruturais de disposição patrimonial pode reduzir a utilidade de eventual pronunciamento final do Tribunal no mérito, caso se identifiquem falhas relevantes no processo decisório ou no tratamento de alternativas. Ao mesmo tempo, reconheço que medidas indiscriminadas que inviabilizem o funcionamento mínimo do regime podem produzir perigo na demora reverso, com impactos sobre credores, depositantes e custos de resolução, em especial com reflexos no FGC. Essa tensão recomenda cautela, instrução adequada e eventual calibragem estritamente finalística.

17.         Por essas razões, não se mostra adequado antecipar juízo conclusivo acerca do preenchimento (ou não) dos pressupostos para eventual medida cautelar antes de iniciada a inspeção e de reunidos elementos primários suficientes. Isso, contudo, não elide



**TRIBUNAL DE CONTAS DA UNIÃO**
Gabinete do Ministro Jhonatan de Jesus

o caráter de alerta: diante do risco de prática de atos potencialmente irreversíveis, não se descarta que venha a ser apreciada, em momento oportuno, providência cautelar dirigida ao Banco Central do Brasil, de natureza assecuratória e com contornos estritamente finalísticos e proporcionais, voltada à preservação do valor da massa liquidanda e da utilidade do controle externo, desde que amparada em elementos objetivos, com motivação expressa e ponderação específica quanto ao perigo na demora reverso.

18.      Diante do exposto, **acolhendo a proposta formulada pela unidade técnica especializada, e com fundamento no art. 240 do Regimento Interno do TCU, determino, com a máxima urgência, a realização de inspeção no Banco Central do Brasil**, para exame *in loco* do acervo necessário, em ambiente seguro e sob as cautelas de sigilo legal, com vistas a reconstruir o fluxo de supervisão e resolução no período 2019–2025, verificar motivação, coerência e proporcionalidade, examinar a consideração de alternativas menos gravosas e aferir, com rastreabilidade documental, o tratamento conferido a tratativas relevantes de mercado, inclusive aquelas apresentadas em janela imediatamente anterior à decretação do regime, sem prejuízo de outros pontos que a equipe entenda pertinentes no planejamento, com as cautelas de praxe.

19.      Para a execução da inspeção, a AudBancos deverá adotar providências compatíveis com os pontos de atenção identificados no corpo deste despacho, notadamente: assegurar acesso integral aos processos e autos internos pertinentes (com destaque para o PE nº 285696 e correlatos); obter e examinar versões sucessivas de manifestações técnicas e jurídicas e registros de consolidação; colher e analisar os registros formais da reunião/videoconferência de 17/11/2025 e do processo instaurado em 18/11/2025; reconstruir cronologia e documentação das tratativas envolvendo soluções privadas com participação do FGC e iniciativas relacionadas a potenciais adquirentes e reorganizações; examinar a governança decisória interna (instâncias, fluxos, registros de deliberação); e, quando pertinente ao risco sistêmico, mapear exposições relevantes a investidores institucionais. Deverá, ainda, com base em conteúdo probatório, reconstruir e documentar, no período 2019–2023, a evolução do modelo de *funding* e do perfil de captação do conglomerado (inclusive instrumentos distribuídos em plataformas), a existência de alertas internos correlatos e o escalonamento de ações de supervisão adotadas em face desse quadro, permitindo aferir tempestividade, proporcionalidade e suficiência das providências prudenciais no intervalo. O trabalho deverá ser conduzido com rastreabilidade suficiente para permitir reconstituição do fluxo decisório e teste de coerência das premissas expostas na Nota Técnica, sem prejuízo de ulterior deliberação

20.      Por fim, acolho os fundamentos da unidade para indeferir a solicitação de ingresso como interessado formulada pelo Instituto de Previdência de Itaguaí (peça 22), por não demonstrada razão legítima para intervir no feito. Ademais, tendo em vista a existência de feito em trâmite no Supremo Tribunal Federal com temática conexa, dou ciência desta decisão à Presidência daquela Corte e ao Exmo. Ministro Dias Toffoli, relator da Reclamação Constitucional nº 88.121/DF, para fins de conhecimento e de eventual prevenção em feitos futuros conexos.

Encaminhem-se os autos à unidade técnica.


(*Assinado eletronicamente*)
MINISTRO JHONATAN DE JESUS
Relator

# EXHIBIT B

**Exclusive: 'Deliquidating' Banco Master would be useless, says deputy attorney general of the MP at the TCU**

Deputy Attorney General Lucas Rocha Furtado, of the Public Prosecutor's Office at the Federal Court of Accounts (TCU), said in an interview with Valor that there was no request on his part "to reverse the extrajudicial liquidation or interfere" in the process related to Banco Master, conducted by the Central Bank. According to him, "deliquidating" Master would be useless, since this would not solve the bank's insolvency problem.

It was from Furtado's representation that the reporting minister of the process, Jhonatan de Jesus, threatened to reverse or interfere in decisions of the Master's liquidation process. The financial institution was liquidated by the Central Bank after the discovery of financial fraud - on the same day, the Federal Police launched an operation that arrested the bank's owner, Daniel Vorcaro. He denies wrongdoing.

According to the MP-TCU member, his initial intention was only for the Court of Auditors to verify exactly the opposite. "If an untimely performance in relation to the Master could have contaminated the financial market, someone may have profited from any previous omissions by the Central Bank," the prosecutor justified in the interview.

"The objective is to analyze the conduct of the public agents involved. The attempt to sell the Master to BRB turned on the red light", commented Furtado.

Yesterday, Jhonatan de Jesus, in an order, again said that the granting of a possible precautionary measure related to the sale of Master's assets within the scope of the extrajudicial liquidation remains on the radar. Today, the Central Bank appealed the decision that ordered the inspection of the bank's documentation.

**Read the full interview:**

**Valor: You were the author of the representation asking for an evaluation of the BC's performance in the case of Banco Master. What was the initial purpose of its representation?**

**Lucas Rocha Furtado:** To verify whether an untimely performance in relation to the Master could have contaminated the financial market, as well as whether someone may have profited from any previous omissions by the Central Bank.

**Valor: The reporting minister, Jhonatan de Jesus, now threatens to suspend or interfere in acts of liquidation. Was that your initial goal?**

**Furtado:** There was no request on my part to reverse the liquidation or interfere in the process. The objective is to analyze the conduct of the public agents involved. The attempt to sell Master to BRB turned on the red light.

**Valor: What is the impact of a future decision by the TCU interfering in the act of liquidation?**

**Furtado:** You have to act very carefully. We know that the supervision of the financial system is the responsibility of the Central Bank, which does not remove the competence of the TCU to inspect the bodies of the Union. Someone must exercise this mission, which is not grateful. 'Deliquidating' the bank would be the same as revoking the law of gravity: useless.

**Original text:**  https://valor.globo.com/financas/noticia/2026/01/06/exclusivo-desliquidar-o-banco-master-seria-inutil-diz-subprocurador-do-mp-

tcu.ghtml?utm_source=aplicativoValor&utm_medium=aplicativo&utm_campaign=compartilha
r


globo.com | g1 | ge | gshow

Menu    Buscar              Valor | Finanças          M Marcelo

Valor One
Comece 2026 com as melhores ferramentas para cuidar dos seus investimentos
Acesse agora ➡

M ALTA   'DESLIQUIDAÇÃO' DO MASTER?   MERCADOS AO VIVO   BONDS DA VENEZUELA   COMPRA POR AGENTE DE IA   IPO DA PICPAY NOS EU

# Exclusivo: 'Desliquidar' Banco Master seria inútil, diz subprocurador-geral do MP junto ao TCU

Lucas Rocha Furtado diz que não houve qualquer pedido de sua parte para reverter o processo determinado pelo Banco Central

Por **Guilherme Pimenta**, Valor — Brasília

06/01/2026 13h39 · Atualizado agora

    Presentear matéria

CONTINUA DEPOIS DA PUBLICIDADE



O subprocurador-geral Lucas Rocha Furtado, do Ministério Público junto ao Tribunal de Contas da União (TCU), disse em entrevista ao **Valor** que não houve qualquer pedido de sua parte "para reverter a liquidação extrajudicial ou interferir" no processo referente ao Banco Master, conduzido pelo Banco Central. Segundo ele, "desliquidar" o Master seria inútil, uma vez que isso não resolveria o problema de insolvência do banco.



Foi a partir da representação de Furtado que o ministro-relator do processo, Jhonatan de Jesus, **ameaçou reverter ou interferir em decisões do processo de liquidação do Master**. A instituição financeira foi liquidada pelo Banco Central após a descoberta de fraudes financeiras - no mesmo dia, a Polícia Federal deflagrou uma operação que prendeu o dono do banco, Daniel Vorcaro. Ele nega irregularidades.

CONTINUA DEPOIS DA PUBLICIDADE

**Leia também:**

**Herdeiro do grupo Rodobens morre em Trancoso aos 51 anos**

**Ex-sócio de Vorcaro e executivos do Master vão depor à PF neste mês**

Segundo o membro do MP-TCU, sua intenção inicial foi somente que a Corte de contas verificasse exatamente o contrário. "Se uma atuação intempestiva em relação ao Master poderia ter contaminado o mercado financeiro, alguém pode ter lucrado com eventuais omissões prévias do BC", justificou o procurador na entrevista.

"O objetivo é analisar a conduta dos agentes públicos envolvidos. A tentativa de venda do Master ao BRB acendeu a luz vermelha", comentou Furtado.

Ontem, Jhonatan de Jesus, em despacho, voltou a dizer que a concessão de uma eventual medida cautelar relacionada à venda de ativos do Master no âmbito da liquidação extrajudicial continua no radar. Hoje, o **BC recorreu da decisão que determinou a inspeção na documentação do banco**.

## Leia a entrevista na íntegra:

**Valor: O sr. foi o autor da representação pedindo a avaliação da atuação do BC no caso do Banco Master. Qual foi o propósito inicial de sua representação?**

**Lucas Rocha Furtado:** Verificar se uma atuação intempestiva em relação ao Master poderia ter contaminado o mercado financeiro, bem como se alguém pode ter lucrado com eventuais omissões prévias do BC.

1/6/26, 8:06 PM
Exclusivo: 'Desliquidar' o Banco Master seria inútil, diz subprocurador-geral do MP no TCU | Finanças | Valor Econômico

Case 25-24568-SMG Doc 21-1 Filed 01/07/26 Page 24 of 30



Menu 🔍     Valor | **Finanças**      Marcelo

---

**Furtado:** Não houve qualquer pedido da minha parte para reverter a liquidação ou interferir no processo. O objetivo é analisar a conduta dos agentes públicos envolvidos. A tentativa de venda do Master ao BRB acendeu a luz vermelha.

**Valor: Qual o impacto de uma futura decisão do TCU interferindo no ato da liquidação?**

**Furtado:** É preciso agir com muito cuidado. Sabemos que a fiscalização do sistema financeiro cabe ao Banco Central, o que não retira a competência do TCU para fiscalizar os órgãos da União. Alguém deve exercer essa missão, que não é grata. 'Desliquidar' o banco seria o mesmo que revogar a lei da gravidade: inútil.

CONTINUA DEPOIS DA PUBLICIDADE

Menu    🔍      Valor | **Finanças**      Ⓜ Marcelo



Subprocurador-geral do MP-TCU, Lucas Furtado Rocha — Foto: Divulgação/TCU

 

Menu

Valor | Finanças

M Marcelo

Conheça o Valor One
Acompanhe os mercados com nossas ferramentas ACESSAR GRATUITAMENTE ›

BRB

Conteúdo publicitário

Tome uma colher de estômago vazio e veja a gordura descer pelo ralo

Progresso e Saúde | Patrocinado          Saiba Mais

Novo modelo de Ar portátil chega até 15 graus em segundos e sem precisar instalação
Resfrie qualquer ambiente em até 3 minutos com este ar portátil potente e silencioso. Sem instalação, com bateria de longa duração e baixo consumo de energia. Ideal para quarto…
Ar Portátil Super Potente | Patrocinado          Leia mais

Especialista em intestino: "Imploro a todos brasileiros que lavem o intestino com isso"
Revista Saúde | Patrocinado

1 colher de chá antes de dormir derrete gordura corporal – Suas roupas vão voltar a servir
Progresso e Saúde | Patrocinado          Saiba Mais

Voe para a Europa a partir de 25€
Com a Air Europa, encontre os melhores destinos pelo melhor preço.
Air Europa | Patrocinado

Este avanço silencioso no agro pode transformar o rendimento das lavouras em 2025
A Frente do Mercado | Patrocinado

Veja o valor da sua casa instantaneamente
Calculadora Valor Imóveis | Patrocinado

Muita gordura na barriga? Faça isso antes de dormir
Dicas | Patrocinado          Veja agora

A inteligência artificial que está mudando tudo no campo — e quase ninguém está falando sobre
A Frente do Mercado | Patrocinado

Menu

Valor ECONÔMICO | **Finanças**

M Marcelo

**NeuroFit** | Patrocinado

Especialista em intestino: "Façam isso antes de dormir para aliviar o intestino preso"

**Revista Saúde** | Patrocinado

Novo, potente, portátil e sem instalação, gela de verdade!
Resfrie qualquer ambiente em até 3 minutos com este ar portátil potente e silencioso. Sem instalação, com bateria de longa duração e baixo consumo de energia. Ideal para quarto…

**Ar Portátil Super Potente** | Patrocinado

Leia mais

## Mais do Valor **Econômico**



### Febraban diz ter identificado 'volume atípico' de postagens em redes sociais relacionadas ao caso Master

Ofensiva utilizou contas conhecidas por promover celebridades para questionar a credibilidade de órgãos como o Banco Central e a Febraban

06/01/2026, 19:47 — Em Finanças



### Lula retorna a Brasília após Réveillon no Rio

Presidente deve retomar agendas de compromisso a partir de quarta-feira

06/01/2026, 19:29 — Em Política



### Embraer entregou 91 aeronaves no 4º tri de 2025, no total de 244 unidades no ano

No 4º tri, foram entregues 32 novos jatos comerciais — 15 do modelo E195-E2, o maior avião do segmento em produção pela Embraer

06/01/2026, 19:05 — Em Empresas

1/6/26, 8:06 PM
Case 25-24568-SMG Doc 21 til Filed 01/07/26 Page 28 of 30
Exclusivo: Desliquidar o Banco Master seria inútil, diz subprocurador-geral do MP junto ao TCU | Finanças | Valor Econômico

**Valor** | **Finanças**

Ⓜ Marcelo



### Ibovespa fecha em alta de mais de 1% em dia favorável a risco e dólar cai a R$ 5,37

Sessão é marcada por agenda esvaziada e desdobramentos da invasão dos EUA à Venezuela

06/01/2026, 18:48 — Em Finanças



### Hospitais do Rio planejam entrar na Justiça para que Unimed Brasil assuma passivo de R$ 2 bi

06/01/2026, 18:44 — Em Empresas



### Trump e assessores discutem alternativas para controlar Groenlândia e militares dos EUA são uma opção, diz Casa Branca

Presidente americano considera a aquisição do território como prioridade de segurança nacional para os Estados Unidos

06/01/2026, 18:34 — Em Mundo



### Alcolumbre também deve faltar à cerimônia do Planalto pelo 8 de janeiro

06/01/2026, 18:28 — Em Política



Menu    🔍                    Valor **Finanças**                    Ⓜ Marcelo



Ao contrário de rivais, como a Meta e o X, o Telegram tem menos de 100 funcionários em tempo integral, e só há pouco tempo, começou a conseguir receitas substanciais de seu 1 bilhão de usuários

06/01/2026, 18:28 — Em Empresas

**VEJA MAIS**

SIGA



EDIÇÕES | GLOBO CONDÉ NAST



| Valor | O Globo |
|---|---|
| Edição impressa | Extra |
| Valor PRO | CBN |
| Valor RI | Autoesporte |
| Valor International | BHFM |
| Revistas e Anuários | Casa e Jardim |
| Seminários | Casa Vogue |
| Valor 360 | |
| Pipeline | |
| Valor Investe | |
| Valor One | |
| Valor Pro | |

| Crescer | Monet |
|---|---|
| Época Negócios | Quem |

1/6/26, 8:06 PM

Exclusivo: Desliquidar o Banco Master seria inútil, diz subprocurador-geral do MP junto ao TCU | Finanças | Valor Econômico

Case 25-24568-SMG Doc 21-1 Filed 01/07/26 Page 30 of 30

| | |
|---|---|
| Globo Rural | TechTudo |
| GQ | Um Só Planeta |
| Marie Claire | Vida de Bicho |
| | Vogue |

QUEM SOMOS

FALE CONOSCO

TERMOS E CONDIÇÕES

TRABALHE CONOSCO

POLÍTICA DE PRIVACIDADE

PRINCÍPIOS EDITORIAIS

ANUNCIE

MINHA EDITORA

© 1996 - 2024. Todos direitos reservados a Editora Globo S/A. Este material não pode ser publicado, transmitido por broadcast, reescrito ou redistribuído sem autorização.