UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

BANCO MASTER S.A., BANCO LETSBANK S.A., BANCO MASTER DE INVESTIMENTO S.A., and MASTER S/A CORRETORA DE CÂMBIO, TÍTULOS E VALORES MOBILIÁRIOS,

Debtor in a Foreign Proceeding
_______________________________________/

Chapter 15
Case No.: 25-24568-SMG

EFB REGIMES ESPECIAIS DE EMPRESAS LTDA., in its capacity as extrajudicial liquidator of the Debtors,

Plaintiff,

v.

Adv. Case No.: ____________

PS-MGG ADMINISTRAÇÃO DE BEM PRÓPRIO, S.A. and INSURED AIRCRAFT TITLE SERVICES,

Defendants.

_______________________________________/

## COMPLAINT

EFB Regimes Especiais de Empresas Ltda., represented by Eduardo Felix Bianchini, in its capacity as extrajudicial liquidator (the "Liquidator") of Banco Master S.A., Banco LetsBank S.A., Banco Master de Investimentos S.A., and Master S/A Corretora de Câmbio, Títulos e Valores Mobiliários (collectively, the "Debtors"), hereby sues PS-MGG Administração de Bem Próprio,

S.A. ("PS-MGG" or "Defendant"), and Insured Aircraft Title Services ("Nominal Defendant") and alleges as follows[1]:

**THE PARTIES**

1. Plaintiff, EFB Regimes Especiais de Empresas Ltda., is a Brazilian company, acting in its capacity as extrajudicial liquidator of the Debtors.

2. On January 8, 2026, the Court entered an Order granting recognition of the Debtors' liquidation proceeding pending before the Central Bank of Brazil (Banco Central do Brasil) ("BACEN") under proceeding number 285696 (the "Brazilian Insolvency Proceeding") and acknowledging the Liquidator as the Debtors' foreign representative under 11 U.S.C. §§ 1515 and 1517 (the "Recognition Order"). *In re Banco Master et al.*, Case No.: 25-24568 (Bankr. S.D. Fla. Jan. 8, 2026), ECF No. 23. The Recognition Order empowers the Liquidator with the full administration and realization of all or part of the Debtors' assets within the territorial jurisdiction of the United States. *Id.*

3. Defendant, PS-MGG, is a Brazilian company which was the registered owner of that certain Gulfstream Aerospace GVIII (G700) airframe, manufacturer's serial number 87039, together with two (2) installed Rolls-Royce model Derby PLC BR700-730B2 engines bearing manufacturer's serial numbers 32031 and 32032, and one (1) installed Honeywell model RE220 (GVIII-G700) auxiliary power unit bearing P-2021, all appurtenances, appliances, parts, avionics, instruments, components, accessions, furnishings, items of equipment and accessories installed thereon or appurtenant thereto, loose equipment normally a part of the Aircraft in the possession or control of a seller, and all Aircraft Documents (the "Gulfstream") which is the subject of this

[1] Please note, in order to comply with Brazilian Law, the Liquidator files this version of the complaint which redacts certain information. Concurrently herewith, the Liquidator files a motion for leave to file the unredacted version of the complaint under seal. As further explained therein, the Liquidator requests that the unredacted version of the complaint be maintained under seal.

action. PS-MGG further claims an interest in, and is the intended recipient of, proceeds arising from the sale of the Gulfstream ultimately to Flexjet LLC (as alleged and further explained below), including funds currently being held by a United States-based escrow agent.

4. The Plaintiff names Insured Aircraft Title Services as a nominal defendant solely because it currently holds certain funds that are the subject of Plaintiff's claims. Plaintiff does not allege that Insured Aircraft Title Services participated in, facilitated, or had knowledge of the fraudulent transfers alleged herein. Rather, Insured Aircraft Title Services is named solely as a necessary party to provide notice of Plaintiff's claims and to permit the Court to enter appropriate relief concerning the disposition of the funds held in escrow. Nominal Defendant, Insured Aircraft Title Services, is incorporated in the state of Oklahoma and maintains its principal place of business located at 21 East Main Street, Suite 100 Oklahoma City, Oklahoma 73104.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O).

6. In the alternative, this matter is a related proceeding under 28 U.S.C. § 157(c)(1).

7. Venue is proper in this district under 28 U.S.C. § 1409(a).

8. The Court has *in rem* jurisdiction over the funds currently held in the account of Insured Aircraft Title Services, the Subject Funds, as defined herein, pursuant to 28 U.S.C. §§ 157 and 1334(e).

9. This Court has personal jurisdiction over PS-MGG, pursuant to Federal Rule of Bankruptcy Procedure 7004(d), which authorizes nationwide service of process in adversary proceedings, and Federal Rule of Civil Procedure 4(k)(2), made applicable by Federal Rule of Bankruptcy Procedure 7004(a), because PS-MGG is not subject to general jurisdiction in any state's courts of general jurisdiction and has sufficient contacts with the United States as a whole

to satisfy due process. PS-MGG's contacts with the United States arise from the acquisition, ownership, and subsequent sale of the Gulfstream. Although Domus Realty Participações, S.A. ("Domus") was identified as the purchaser under the original purchase agreement with Gulfstream Aerospace Corporation, a United States aircraft manufacturer, PS-MGG ultimately took delivery of the Gulfstream and became its registered owner. As described herein, the purchase price for the Gulfstream was paid through a series of transfers that were directed to Gulfstream Aerospace Corporation through accounts maintained at JPMorgan Chase Bank in the United States for the benefit and at the direction of PS-MGG. PS-MGG thereafter knowingly accepted title to and ownership of the Gulfstream after it [redacted] through United States banking institutions and to a United States corporation. As described in further detail below, PS-MGG subsequently entered into an aircraft purchase agreement with Jetcraft Corporation for the sale of the Gulfstream. Jetcraft thereafter entered into a separate agreement to sell the Gulfstream to Flexjet LLC. In connection with that transaction, Flexjet transferred approximately USD $86,700,000 into an escrow account maintained by Insured Aircraft Title Services in the United States. Thereafter, funds from that United States escrow account were distributed for the benefit of PS-MGG, including transfers totaling at least USD $42,000,000 to PS-MGG. Upon information and belief, approximately USD $42,000,000 of the proceeds from the sale of the Gulfstream remains in the United States in escrow and is being held for the benefit of PS-MGG.

10. All conditions precedent to bringing the claims alleged herein have been satisfied or waived.

***The Debtors' Liquidations***

11. The Debtors are financial institutions organized under the laws of Brazil. Banco Master began operations in 1974, under the name Banco Máxima.

12. During the 2010s, Banco Máxima experienced a prolonged period of financial distress. Investigations resulted in the disqualification of its former controllers and administrators, who in 2018 transferred control of Banco Máxima to Daniel Bueno Vorcaro ("Vorcaro") to restructure and revitalize the bank. BACEN approved the transaction in 2019.

13. At all relevant times, Vorcaro was the President and indirect majority shareholder of Banco Master.

14. Vorcaro rebranded Banco Máxima as Banco Master in 2021 and implemented a restructuring plan to capitalize Banco Master through the issuance of Certificates of Deposit ("CDBs") that offered above-market, inflated returns. Initially, this strategy seemed very successful, leading to record growth by Banco Master in 2023 and 2024.

15. In 2025, BACEN's investigations into Banco Master revealed irregularities relating to the use of the funds raised from the issuance of CDBs and the funds deposited by the bank's account holders, including questions as to the destination of such funds. These investigations led to the conclusion that at least part of the funds invested through the issuance of the CDBs and funds deposited by account holders had been illicitly dissipated.

16. BACEN's investigations led to (i) the entry of the orders placing Banco Master and the other Debtors in an extrajudicial liquidation, and (ii) the entry of the Freeze Orders (as defined below) as to Vorcaro and other shareholders, administrators, and executives of Banco Master and its affiliates.

17. On November 18, 2025, Vorcaro was arrested by the Brazilian Federal Police on suspicion of committing a R$ 12,200,000,000 (approx. USD $2,276,400,000[2]) fraud against the Brazilian financial system. He was released on November 28, 2025, on the condition that he wear an electronic ankle bracelet while the ongoing investigation against him continued.

18. On November 18, 2025, BACEN ordered the extrajudicial liquidation of the Debtors and appointed the Liquidator to serve as the extrajudicial liquidator of the Debtors pursuant to Ato do Presidente Nos. 1.369, 1.371, 1.372, and 1.373.

19. In connection with the Brazilian Insolvency Proceeding, BACEN entered orders No. 44.234, No. 44.236, No. 44.237, No. 44.238, and No. 44.825 as to each of the Debtors (collectively, the "Freeze Orders"), which froze and/or prohibited certain of the Debtors' former shareholders, executives, and administrators, including Vorcaro specifically (collectively, the "Asset Freeze Parties"), from selling and/or disposing of their assets.

***The Chapter 15 Case***

20. On December 10, 2025, the Liquidator filed a petition for recognition of the Debtors' Brazilian Liquidation as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 1501 *et seq. In re Banco Master, et al.*, No. 25-24568-SMG (Bankr. S.D. Fla. Dec. 10, 2025), ECF Nos. 1-2.

21. On January 8, 2026, the Court entered the Recognition Order granting recognition of the Debtors' Brazilian Liquidation as a foreign main proceeding and acknowledging the Liquidator as the "foreign representative." *Id.*, ECF No. 23.

[2] Based on the average conversion rate for the month of November 2025 at of 0.1897 Brazilian Reais per 1.00 United States Dollar.

22. Among other things, the Recognition Order entrusted the Liquidator with the full administration and realization of all or part of the Debtors' estates and assets within the territorial jurisdiction of the United States. *Id.*

23. On March 4, 2026, the Brazilian Supreme Court ordered that Vorcaro be re-arrested due to the recent discovery of continued criminal activity in connection with the Banco Master fraud while under house arrest, including continuing to hide billionaire resources in the name of third parties, hiding more than 2 billion reais with companies accused of laundering money from the most dangerous criminal organizations in Brazil, and issuing direct orders to others to practice acts of intimidation of people including business competitors, former employees, journalists, all of which would be seen as harmful to the interests of the organization, and with a view to obstruction of justice.

***Daniel Vorcaro's Use of Investment Funds and the Debtors' Wholly-Owned Companies and Investment Funds to Effectuate the Fraudulent Scheme***

24. Vorcaro and his co-conspirators employed a complex scheme to conceal the dissipation of tens of billions of Brazilian Reais (well over USD $12,000,000,000)[3] from the Debtors using Brazilian investment funds owned and/or controlled by the Debtors, Vorcaro, and related third parties, and companies and offshore structures owned and/or controlled by Vorcaro and his co-conspirators (the "Intermediary Entities").

25. In one iteration of the fraudulent scheme, Vorcaro would cause Banco Master to transfer the funds obtained from the bank's depositors and investors to: (i) execute investments through funds or corporations that were jointly-owned by him through or with related parties and/or (ii) *invest* in Brazilian investment funds that he directly or indirectly controlled through

[3] Please note, the investigations remain ongoing to determine the full scope of the amount diverted from the Debtors.

intermediaries and/or related parties (each, a "Fund") for the stated purpose of acquiring interests (or "quotas") in the Fund.

26. In turn, the Fund would transfer the monies obtained from Banco Master (through one or more subsequent transactions) to purchase and overpay for "assets" that had little or no value ("Junk Assets") from entities or parties that were (i) controlled by and/or were alter egos of Vorcaro, or (ii) participants in the fraud.

27. In another iteration of the fraudulent scheme, Vorcaro and his co-conspirators effectuated a similar fraud through which Vorcaro would cause Banco Master to transfer monies in exchange for receivables that had no significant value for prices many times higher, such that Banco Master funds would be transferred to entities that Vorcaro and/or his conspirators controlled.

28. The purpose of these transactions was to, among other things, (i) transfer the Debtors' assets for no significant value and (ii) conceal such transfers by disguising the dissipation of funds as the acquisition of "assets" on the Debtors' books and records that, in reality, had little or no value.

29. As part of the foregoing fraud, for example, Vorcaro caused Banco Master to (i) directly or indirectly transfer approximately R$ 2,000,000,000 (approx. USD $390,400,000[4]) to the Brazilian investment fund Astralo Fundo de Investimento Multimercado Credito Privado Investimento no Exterior (the "Astralo Fund") from 2021 to 2023; and (ii) utilize Máxima Fundo de Investimento Multimercado Credito Privado 2 (the "Maxima Fund"), a Brazilian Investment fund wholly controlled by Banco Master, to further directly or indirectly transfer R$ 285,800,000

[4] Based on the average conversion rate for the years 2021 through 2023 at 0.1952 Brazilian Real per 1.00 United States Dollar.

(approx. USD $51,133,050[5]) to the Astralo Fund in 2025, a fund wholly controlled by Vorcaro and/or his co-conspirators.

30. In 2023, the Astralo Fund, through one of its funds, made contributions totaling nearly one-and-a-half billion Brazilian Reais (R$ 1.5 billion (approx. USD $300,600,000[6]) to Super Empreendimentos e Participações, S.A. ("Super Empreendimentos"), which, upon information and belief, is a conduit company utilized by Vorcaro and his co-conspirators as a vehicle for dissipating monies from Banco Master and as explained in detail below. [redacted] were specifically used in connection with the acquisition of the Gulfstream.

31. The Astralo Fund, in turn, holds a significant stake in various other funds and investments vehicles such as its controlling interest in the quotas of Rio Vermelho Fundo de Investimento em Direitos Creditórios Não Padronizado (the "Rio Vermelho Fund") and its at least R$ 178,853,930.40 (approx. USD $35,842,327[7]) stake in the Units of Lunar Fundo de Investimento em Participações Multiestratégia (the "FIP Lunar Fund"), which were both used as instruments for the acquisition and concealment of assets intended for the personal use and benefit of Vorcaro.

***The Entre Investimentos Structure and the Involvement of Co-conspirator, Antônio Carlos Freixo Júnior ("Mineiro")***

32. One of the specific structures created and employed by Vorcaro and his co-conspirators to dissipate Banco Master's assets in conjunction with the aforementioned Astralo Fund, Rio Vermelho Fund, and FIP Lunar Fund, was controlled and held through Entre

[5] Based on the average conversion rate for the year of 2025 at 0.1791 Brazilian Real per 1.00 United States Dollar.
[6] Based on the average conversion rate for the year of 2023 at 0.2004 Brazilian Real per 1.00 United States Dollar.
[7] *Id.*

Investimentos e Participações Ltda., a company incorporated under the laws of Brazil ("Entre Investimentos").

33. Entre Investimentos is, at least formally, wholly owned by Cactus Assessoria e Serviços Ltda., a company whose alleged purpose included financial advisory services and asset management which is controlled by its partner, Antônio Carlos Freixo Júnior also known as "Mineiro". Mineiro is an accomplice to the fraud alleged to have been masterminded by Vorcaro.

34. In fact, through the course of the Liquidator's investigations, the Liquidator has uncovered information regarding the existence of offshore trust structures established for the benefit of Vorcaro and Mineiro appears to have directly participated in the transfer of funds to sustain these entities. For example, Mineiro allegedly transferred USD $5,000,000 into Mosaic Financial Ltd., an asset management company which used to manage Vorcaro's assets, intending to maintain the assets of these structures for the benefit of Vorcaro. Of these USD $5,000,000, a portion equivalent to USD $1,000,000 was to be allocated to a trust for the benefit of Vorcaro and another USD $1,000,000 for the payment of credit card expenses incurred by Vorcaro.

35. As part of the ongoing fraud, Vorcaro caused Banco Master to directly or indirectly transfer, between August 2022 and November 2025, approximately [redacted] without any identifiable collateral, known contractual basis, or legitimate business purpose. As soon as the funds were made available, [redacted] transferred the funds on the same day to its other accounts held at different financial institutions and to accounts held by [redacted]. Between October 24, 2025 and November 10, 2025 (weeks before BACEN declared the Debtors' extrajudicial liquidation) Banco Master credited [redacted]

[8] Based on the average conversion rate for the years 2022 through 2025 at 0.1908 Brazilian Real per 1.00 United States Dollar.

[redacted].

36. As recited previously, the Astralo Fund holds an approximate R$ 178,853,930.40 (approx. USD $35,842,327[11]) stake in the quotas of FIP Lunar. Upon information and belief, all or most of FIP Lunar's remaining quotas were subscribed by other funds owned by Entre Investimentos such that FIP Lunar's entire capital funding appears to derive from monies trickling down a complex corporate structure designed to dissipate funds originating from Banco Master.

37. In 2021, FIP Lunar entered into a private agreement for the purchase and sale of shares and other covenants with Entre Investimentos, through which the FIP Lunar Fund acquired 58,395,748 common registered shares representing 100% of the share capital of Prime Aviation 2 Participações, S.A., currently known as Domus, from Entre Investimentos for the amount of R$ 180,000,000 (approx. USD $33,408,000[12]). However, upon information and belief, despite having signed this agreement, the shares were not transferred to FIP Lunar.

38. Despite Entre Investimentos' alleged disposition and transfer of its entire Domus share capital to FIP Lunar, the Liquidator's investigations have revealed that Entre Investimentos has continued and consistently controlled Domus as its shareholder through its participation in shareholders' meetings, endorsement of corporate resolutions, maintenance of corporate influence over Domus, and even appearing as Domus' shareholder in the company's corporate records held by the Sao Paulo State Corporate Register.

***The [redacted] and Prime Aviation Participações e Serviços ("Prime Aviation") Structure***

---

[9] Based on the average conversion rate for the month of November 2025 at of 0.1897 Brazilian Reais per 1.00 United States Dollar.
[10] *Id.*
[11] Based on the average conversion rate for the year of 2023 at 0.2004 Brazilian Real per 1.00 United States Dollar.
[12] Based on the average conversion rate for the year 2021 at 0.1856 Brazilian Real per 1.00 United States Dollar.

39. Another of the specific structures employed by Vorcaro and his co-conspirators to dissipate Banco Master's assets was the use of a fractional ownership investment structure operated through entities formerly known as [redacted] and later rebranded as Prime Business (the "[redacted] Structure"). [redacted] was the controlling shareholder of the [redacted] Structure under which there were several special purpose vehicles/corporations ("SPVs"), which were designed to acquire high-value assets, each of which would receive monies diverted from Banco Master to use in the acquisition of and maintaining title to a particular luxury asset. Once the luxury asset was acquired, rather than selling the underlying assets outright, the [redacted] Structure would divide ownership of the SPVs into fractional equity interests, which could then be marketed and sold to high-net-worth individuals seeking indirect ownership interests in luxury assets. Through this structure, individuals could acquire interests in multiple high-value assets without acquiring sole ownership of any single asset.

40. Although marketed as a fractional ownership business, the [redacted] Structure was ultimately controlled through a chain of entities connected to Vorcaro. Upon information and belief, Vorcaro utilized this structure, including the various SPVs established to hold valuable assets, the funds used to purchase which, upon information and belief, originated from funds improperly diverted from Banco Master, effectively utilizing the [redacted] Structure as a series of vehicles through which assets could be acquired, transferred, and concealed from Banco Master and its creditors.

***[redacted] and PS-MGG Benefitted from these Fraudulent Schemes***

41. Although PS-MGG and several other corporations within the [redacted] Structure are nominally owned by [redacted] (e.g., [redacted] holding 99.99% of PS-MGG's shares), the Liquidator's investigations have revealed that (i) Vorcaro is the ultimate beneficial owner of the [redacted]

Structure and all the assets underlying it, and (ii) [redacted] as "parent" to the [redacted] Structure and PS-MGG as one of its underlying SPVs, were but mere vehicles used by Vorcaro and his co-conspirators for the acquisition of high-end assets and properties such as the Mode Bleu, a Yacht, Model IM 95 (the "Yacht") for the approximate amount of R$ 35,000,000 (approx. USD $6,268,500[13]) currently located in Brazil and the Botanique Hotel (the "Hotel") for approximately R$ 100,000,000 (approx. USD $17,910,000[14]) located in Brazil and the Gulfstream.

42. In fact, Vorcaro not only participated directly in the negotiations regarding several of these assets, but also was the one using them. For example: (i) in the Yacht case, Vorcaro acted as a guarantor for the transaction; (ii) in the Hotel case, Vorcaro is mentioned in letters sent by the "branding company" as one of the owners.

***Daniel Vorcaro's Fraudulent Acquisition of the Gulfstream***

43. Upon information and belief, at the direction of Vorcaro, in or around December 2023, [redacted] (then known as Prime Aviation 2 Participações e Serviços SA ("Prime Aviation 2")) entered into a sales agreement for the acquisition of the Gulfstream for the purchase price of USD $79,440,900 (the "Purchase Price for the Gulfstream"). There, the sales agreement incorporated a schedule for payments directed to Gulfstream Aerospace Corporation's ("Gulfstream Corp.") account number [redacted]5825 with JP Morgan Chase Bank. That schedule was as follows:

a. USD $8,000,000 due no later than December 14, 2023 (the "First Installment");

b. USD $15,500,000 due no later than December 22, 2023 (the "Second Installment");

c. USD $13,000,000 due no later than January 31, 2024 (the "Third Installment");

d. USD $13,000,000 due no later than February 29, 2024 (the "Fourth Installment");

[13] Based on the average conversion rate for the year of 2025 at 0.1791 Brazilian Real per 1.00 United States Dollar.
[14] *Id.*

e. USD $18,000,000 due no later than June 25, 2024 (the "Fifth Installment"); and

f. USD $11,940,900 due no later than at Delivery Time (the "Final Installment").

44. Domus f/k/a Prime Aviation 2 was identified as the purchaser under the sales agreement which is attached hereto as **Exhibit A**.

45. The Liquidator's investigation has revealed that after a series of payments by [redacted] to Gulfstream Corporation as detailed below, PS-MGG, [redacted] wholly owned subsidiary, took delivery of the Gulfstream when the Gulfstream was fully completed instead of [redacted].

46. PS-MGG then registered itself as the owner of the Gulfstream on June 20, 2025 with the Registro Aeronautico Brasileiro (Brazilian Aerospace Registry) maintained by the National Civil Aviation Agency in Brazil.

***The Flow of Funds to Acquire the Gulfstream***

47. [redacted] did not fund the acquisition of the Gulfstream with its own assets nor via legitimate business transactions; rather, the Purchase Price for the Gulfstream was financed entirely from funds fraudulently siphoned from Banco Master through a series of transfers to the Intermediary Companies which served as mere conduits for the benefit of PS-MGG and Vorcaro.

48. Consistent with this scheme, on November 8, 2023 Vorcaro and/or his co-conspirators caused Banco Master to allocate [redacted] of its available, aggregate bank treasury, which is meant to be used by Banco Master to make investments for the benefit of Banco Master, to [redacted]

[redacted]. Banco Master converted those R$ 2,497,500 into USD $500,000 via its account at JP Morgan Chase Bank, account number 891631221 (the "Banco Master JP Morgan Account"), and the exchanged USD $500,000 were credited to the Gulfstream Account, which upon information and belief were credited towards a deposit on the Gulfstream.

49. Nearly a month later, when the First Installment became due and on that same day, Vorcaro and/or his co-conspirators again caused Banco Master to allocate [redacted] of its available, aggregate bank treasury, which is meant to be purportedly used by Banco Master to make investments for the benefit of Banco Master, to [redacted]. That same day, consistent with the other payment to Gulfstream Corp., [redacted]. [redacted]

[redacted]. Banco Master thereafter exchanged its R$ 39,904,000 for USD $8,000,000 via the Banco Master JP Morgan Account and the exchanged USD $8,000,000 were credited to the Gulfstream Account, thereby making the First Installment payment.

50. When the Second Installment came due, Vorcaro and/or his co-conspirators caused Banco Master to again [redacted], of its available, aggregate bank treasury to purportedly wire amounts to another intermediary company, [redacted]. Consistent with the payment for the First Installment, and very shortly after receiving the funds from [redacted]. Banco Master converted the R$ 76,678,500 for USD $15,500,000 via the Banco Master JP Morgan Account and the exchanged USD $15,500,000 were credited to the Gulfstream Account, thereby satisfying the Second Installment payment.

51. The Third Installment followed the same pattern across four days:

a. On January 30, 2024, Vorcaro and/or his co-conspirators caused Banco Master to send [redacted] of its available, aggregate bank treasury, which is meant to be purportedly used by Banco Master to make investments for the benefit of Banco Master, to [redacted].

[15] Please Note, [redacted] is yet another entity controlled by Vorcaro through [redacted].

b. The following day Vorcaro and/or his co-conspirators followed the same pattern, Banco Master sent [redacted] from its bank treasury to [redacted].

c. The next day Vorcaro and/or his co-conspirators again caused Banco Master to send [redacted].

d. Finally, on the fourth day, February 2, 2024, Vorcaro and/or his co-conspirators caused Banco Master to send [redacted].

On February 1, 2024, [redacted] transferred approximately the aggregate total of the funds it received from Banco Master's treasury, [redacted]. That same day, [redacted] received an automatic redemption of the [redacted] investment it had made the day prior in the amount of [redacted]

[redacted] then put together the funds from this redemption and the funds it received from [redacted] and immediately transferred approximately that aggregate amount, [redacted]. Banco Master exchanged the R$ 64,935,000 for USD $13,000,000 via the Banco Master JP Morgan Account and the exchanged USD $13,000,000 were credited to the Gulfstream Account, thereby satisfying the Third Installment payment.

52. In satisfaction of the Fourth Installment, on March 21, 2024, Vorcaro and/or his co-conspirators again caused Banco Master to allocate [redacted] from its treasury, transferring all [redacted]. To repeat the payment scheme devised to satisfy the First Installment, [redacted]. Instead of repeating the scheme precisely, [redacted]. Banco Master converted those R$ 64,935,000 for USD $13,000,000 via the Banco Master JP Morgan Account and the exchanged USD $13,000,000 were credited to the Gulfstream Account, thereby satisfying the Fourth Installment.

53. The Fifth Installment of the Purchase Price for the Gulfstream was likewise funded through the same fraudulent scheme. To satisfy the USD $18,000,000 payment due under the

[16] Please Note: 'Pix' is a "Brazilian instant payment scheme that enables its users to send or receive payment transfers in few seconds at any time[.]" https://www.bcb.gov.br/en/financialstability/pix_en

purchase agreement, on July 1, 2024, Vorcaro and/or his co-conspirators caused Banco Master to allocate [redacted] from its treasury to [redacted], one of the specific [redacted] Structure [redacted], depositing [redacted]. Banco Master then converted those funds into approximately USD $6,200,000 through its correspondent account at JP Morgan Chase Bank and remitted the proceeds to Gulfstream.

54. The balance of the Fifth Installment was funded through the same mechanism just days later. On July 5, 2024, [redacted], which, upon information and belief originates [redacted]. Banco Master converted those funds into USD $11,800,000 through the Banco Master JP Morgan Account and transmitted the proceeds to Gulfstream. Collectively, the July 1 and July 5, 2024 transfers thereby satisfied the Fifth Installment.

55. Upon information and belief and in light of the previous transactions, the Final Installment to acquire the Gulfstream was paid by funds improperly diverted from Banco Master.

56. This acquisition of the Gulfstream was therefore, as demonstrated above, funded with monies fraudulently siphoned from Banco Master as confirmed by the Liquidator's asset tracing investigation explained immediately above (the "Gulfstream Transfers").

57. After the fraudulent acquisition of the Gulfstream, Vorcaro began to use the Gulfstream for several transnational and international trips to the Miami, FL area, the Sardinia region of Italy, and more.

58. However, on November 6, 2025, just a week and a half before BACEN declared the Debtors' extrajudicial liquidation, the Gulfstream's publicly available tracking information went offline (it appears that the transponder was turned off) and its location was not discovered until over a month and a half later when investigations conducted by the Liquidator and his international engaged advisors revealed that it was stored in a private hangar at Basel-Friebourg airport (the "Airport") on the border between France and Switzerland.

***PS-MGG's Back to Back Sale of the Gulfstream to Jetcraft Global Corporation and Flexjet LLC Amongst the Liquidator's Investigations into the Affairs of the Debtors and of Daniel Vorcaro***

59. Shortly after the plane was stored in a private hanger at the Airport, this Court held a hearing to consider the recognition of the Debtors' extrajudicial liquidation proceedings as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, at which time Vorcaro appeared as the only objecting party. This court held a hearing and thereafter this Court granted the Liquidator's petition and afforded the Liquidator certain inherent and discretionary powers including the power to conduct discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy (the "Recognition Order"). *In re Banco Master, et al.*, No. 25-24568-SMG (Bankr. S.D. Fla. Dec. 10, 2025), ECF No. 23.

60. Shortly thereafter, the Liquidator issued several Rule 2004 examination subpoenas to art galleries, banks, and more in conformity with this Court's Recognition Order (the "First and Second Round of Subpoenas"). *Id.,* ECF Nos. 25-46 & 49-54.

61. Except for the limited joinder by the Bank of New York Mellon to Vorcaro's motion for protective order relating to a mooted procedural issue concerning geographical

compliance with the subpoena, Vorcaro was the only party out of the sixteen [16] Asset Freeze Parties referred to in the First and Second Round of Subpoenas and all of the subpoena recipients to raise objections to the First and Second Round of Subpoenas, moving this Court for a protective orders and/or orders quashing the First and Second Round of Subpoenas.

62. This Court denied Vorcaro's motion for protective order on March 26, 2026. *Id.*, ECF No. 78 (the "First Subpoena Order").

63. The Liquidator proceeded to issue a third round of Rule 2004 examination subpoenas, including to Flexjet LLC ("Flexjet") and Jetcraft Global Corporation ("Jetcraft") *Id.*, ECF Nos. 81-91.

64. Vorcaro again objected to these subpoenas [*Id.*, ECF No. 97], took steps to appeal the Court's First Subpoena Order denying his motion for protective order [*Id.*, ECF No. 94], and moved this Court for an order staying the operation of the First Subpoena Order pending resolution of the appeal [*Id.*, ECF No. 96].

65. Soon thereafter, the United States District Court for the Southern District of Florida denied Vorcaro's appeal [*Id.,* ECF No. 135], and this Court denied his third motion for protective order [*Id.,* ECF No. 121] and his motion to stay [*Id.*, ECF No. 116].

66. As set forth below, in the middle of and while Vorcaro consistently attempted to delay the Liquidator's investigations (including later attempts to stay the examination of Jetcraft and Flexjet) PS-MGG proceeded to enter into a back-to-back sale of the Gulfstream to Jetcraft and Flexjet. In fact, the Liquidator's investigations have revealed correspondence between Flexjet and Jetcraft demonstrating that each knew that the Gulfstream was beneficially owned by Vorcaro, knew of the Banco Master liquidation, and proceeded with the sale despite the news of the scandal

being front page news in Brazil (and elsewhere) for an extended period of time which even a cursory and half-hearted internet search would have revealed immediately.

67. This back-to-back sale took place in stages whereby PS-MGG sold the Gulfstream to Jetcraft for USD $86,000,000 which that same day sold the Gulfstream onward to Flexjet for a USD $1,500,000 upcharge for a sale price of approximately USD $87,500,000.

68. On December 31, 2025, PS-MGG and Jetcraft entered into an aircraft purchase agreement for the sale of the Gulfstream with a closing date of March 2, 2026 (the "First Aircraft Purchase Agreement").

69. On February 17, 2026, Jetcraft and Flexjet entered into an aircraft purchase agreement for the sale of the Gulfstream (the "Second Aircraft Purchase Agreement", the First Aircraft Purchase Agreement and the Second Aircraft Purchase Agreement jointly, the "Aircraft Purchase Agreements").The Aircraft Purchase Agreements are attached hereto as **Exhibit B.**

70. The inflow and proceeds from PS-MGG's back-to-back sale of the Gulfstream (the "Gulfstream Sale") under the Aircraft Purchase Agreements were paid as follows:

a. On February 19, 2026, Flexjet sent USD $5,000,000 of funds via wire transfer to the account of the escrow agent, Insured Aircraft Title Services ("IATS")'s account at Bank of America, N.A., account number [redacted]5210 (the "IATS Bank Account").

b. On March 2, 2026, Flexjet sent USD $81,718,000 of funds via wire transfer to the IATS Bank Account;

c. On March 4, 2026, IATS sent USD $24,000,000 of funds via wire transfer to PS-MGG from the IATS Bank Account;

d. On March 11, 2026, IATS sent USD $15,000,000 of funds via wire transfer to PS-MGG from the IATS Bank Account (the "$15 M Transfer");

e. On March 13, 2026, IATS sent USD $3,000,000 of funds via wire transfer to PS-MGG from the IATS Bank Account;

f. On April 29, 2026 IATS sent USD $1,499,950 of funds via wire transfer to Prime Aviation, another one of the SPVs which PS-MGG used as its Broker in the transaction.

71. A portion of the funds in IATS' Bank Account from the Gulfstream Sale, approximately USD $42,000,000 (the "Subject Funds"), was held back to the order of PS-MGG.

**COUNT I**

**CONSTRUCTIVE TRUST AND EQUITABLE LIEN**
(Against PS-MGG regarding the Subject Funds)

72. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

73. PS-MGG obtained funds from Banco Master through fraud and other wrongful conduct, including through the Gulfstream Transfers.

74. Upon information and belief, PS-MGG was unjustly enriched by obtaining the funds diverted from Banco Master and used certain of those funds to purchase the Gulfstream.

75. Since the funds used by PS-MGG did not rightfully belong to it, and PS-MGG used the funds to acquire the Gulfstream, PS-MGG held the Gulfstream for the benefit of Banco Master and there was an implied promise that PS-MGG would return the Gulfstream to Banco Master.

76. Instead, the Defendant failed to return the Gulfstream and sold the Gulfstream to Flexjet and received USD $42,000,000 and a right to collect another USD $42,000,000 from IATS.

77. The Defendant has been unjustly enriched by obtaining the funds used to purchase the Gulfstream, acquiring the Gulfstream, and proceeding to sell the Gulfstream.

78. Banco Master has no adequate remedy at law.

79. Upon information and belief, the $42,000,000 held by IATS to the order of PS-MGG, i.e., the Subject Funds, constitute identifiable proceeds of the misappropriated funds from Banco Master and is held by Defendant in constructive trust for Banco Master.

80. A constructive trust on the Subject Funds is necessary so that PS-MGG will not dispose of the Subject Funds, which are due and owing to Banco Master.

81. Alternatively, in view of the diversion of the Subject Funds from Banco Master by PS-MGG, general considerations of right and justice demand that an equitable lien be placed on the Subject Funds.

WHEREFORE, the Liquidator requests that the Court impose a constructive trust on the Subject Funds in favor of Banco Master, or in the alternative, an equitable lien on the Subject Funds in favor of the Liquidator on behalf of Banco Master. The Liquidator further requests any other and further relief that the Court deems just and proper.

## COUNT II

## CLAWBACK UNDER ARTICLE 130 OF THE BRAZILIAN BANKRUPTCY AND JUDICIAL REORGANIZATION LAW AND ARTICLE 34 OF LAW 6024

(Against PS-MGG Up to the Amount of the Subject Funds)

82. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

83. This is a claim under Articles 130 and 133 of the Brazilian Bankruptcy and Judicial Reorganization Law ("BBJRL") and article 34 of Law 6024.

84. Article 130 of the BBJRL provides that the acts committed with intent to harm creditors are revocable, once the fraudulent collusion between the debtor and the third party with the actual damages suffered by the bankrupt estate is proven.

85. Article 133 of the BBJRL provides that the revocatory claim referred to in Art. 130 can be filed against all who participated in the act or who received payments, collateral or benefited from the act committed with intent to defraud creditors.

86. Article 197 of Law 11.101/2005 provides that the provisions of the Brazilian law regulating insolvency shall apply to extrajudicial liquidation, such as the Debtors' Brazilian Insolvency Proceedings, and for such purpose, the liquidator shall be deemed the equivalent to the judicial administrator.

87. Banco Master, through its former President and ultimate beneficial owner Daniel Vorcaro, diverted funds from Banco Master to companies that were the alter egos of himself and his co-conspirators including [redacted] to fund the acquisition of the Gulfstream through the Gulfstream Transfers for the ultimate benefit of PS-MGG, who took title to and beneficially owned the Gulfstream. Consequently, PS-MGG is a proper defendant to a revocatory action under Articles 130 and 133 of the BBJR because it was a participant in and beneficiary of the foregoing acts committed with intent to defraud Banco Master's creditors.

88. The funds transferred to these companies for the benefit of Vorcaro and Mineiro totaled no less than the Subject Funds.

89. The diverted funds were used by PS-MGG's parent corporation, [redacted], to fund the Purchase of the Gulfstream for the nominal benefit of PS-MGG and ultimately for the Benefit of Vorcaro.

90. The diversion of Banco Master's funds caused harm to the creditors of Banco Master. These creditors continue to be harmed by the Gulfstream Transfers and PS-MGG's continued ownership and control of the proceeds from the Sale of the Gulfstream.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against the Defendant, (i) setting aside the transactions made through the Gulfstream Transfers up to the amount of the Subject Funds (ii) disregarding the transfers to and ordering the Defendant to return to Banco Master the funds transferred to it, up to the amount of the Subject Funds, (iii) attach or levy execution upon the Subject Funds, (iv) restrain PS-MGG from disposing of the Subject Funds, and (v) requesting any other and further relief the Court deems just and proper.

## COUNT III

### FRAUDULENT TRANSFER UNDER THE O.C.G.A. § 18-2-74(a)(1)
(Against PS-MGG Up to the Amount of the Subject Funds)

91. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

92. Banco Master, through its former President and ultimate beneficial owner, Daniel Vorcaro, diverted funds from Banco Master through the Gulfstream Transfers to acquire the Gulfstream for the benefit of PS-MGG.

93. The Gulfstream Transfers were made with the actual intent to hinder, delay, or defraud Banco Master and its creditors, including to remove and conceal dissipated assets and to conceal the beneficial interests of Daniel Vorcaro in the Gulfstream.

94. Circumstances demonstrating such actual intent include, among other things:

a. the transfers were made through a network of related entities controlled by or operating for the benefit of Daniel Vorcaro and his co-conspirators;

b. the funds were transferred through multiple intermediary entities before being used to acquire the Gulfstream;

c. the transaction structure concealed the origin of the funds used to acquire the Gulfstream;

d. the Gulfstream was acquired by and held through PS-MGG, a special purpose vehicle within the [redacted] Structure; and

e. Daniel Vorcaro retained the use and beneficial enjoyment of the Gulfstream after its acquisition despite never holding title to the Gulfstream;

95. The Gulfstream Transfers and resulting ownership structure of the Gulfstream had the effect of removing and concealing assets acquired with funds improperly dissipated from Banco Master.

96. As a result of the foregoing, Banco Master has a claim against, and at all relevant times was a creditor of, each of the entities that received the foregoing transfers and against the Defendant as participant in (and beneficiary of) the foregoing fraudulent transactions.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against the Defendant, (i) for damages up to the amount of the Subject Funds, plus pre- and post-judgment interest, attorneys' fees, and costs, (ii) attaching or levying execution upon the Subject Funds, (iii) enjoining the Defendant from taking any action to dispose of the Subject Funds, (iv) appointing a receiver to take charge of the Subject Funds and/or any other property of the Defendant, and (v) requesting any other and further relief the Court deems just and proper.

**COUNT IV**

**COMPENSATION FOR DAMAGES CAUSED BY ILLICIT ACTS UNDER BRAZILIAN LAW**

(Against PS-MGG Up to the Amount of the Subject Funds)

97. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

98. This is a claim under Articles 186, 187 and 927 of the Brazilian Civil Code.

99. Article 186 of the Brazilian Civil Code imposes liability where a defendant undertook an illicit act either negligently or with the intention to cause damage (i.e., willful misconduct), that violates the plaintiff's rights, causing damage. Article 187 of the Brazilian Civil Code extends liability to the holder of a right who, in exercising it, clearly exceeds the limits imposed by its economic or social purpose, good faith, or good customs. Article 927 of the Brazilian Civil Code states that a party whose illicit acts damage others is obliged to pay damages.

100. Vorcaro and his co-conspirators, through entities under their control, including PS-MGG, entered transactions through the Gulfstream Transfers even though Banco Master obtained no economic benefit in these transactions. Ultimately, the Defendant used the amounts received from these transactions to acquire the Gulfstream.

101. Upon information and belief, PS-MGG either knew or should have known that it received monies directly or indirectly linked to funds illicitly dissipated from Banco Master. Therefore, PS-MGG exceeded the limits imposed by the economic and social purposes of the rights it held as a company.

102. PS-MGG either knew or should have known that it accepted funds fraudulently dissipated from Banco Master and proceeded to utilize said funds to fund the acquisition of the Gulfstream, causing significant damage to the bank for its own benefit and/or the benefit of Vorcaro.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against the Defendant for monetary damages sufficient to compensate Banco Master for the

injuries resulting from Defendant's illicit acts in violation of Brazilian law, plus pre- and post-judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper.

**COUNT V**

**CIVIL CONSPIRACY TO COMMIT FRAUD**
(Against PS-MGG Up to the Amount of the Subject Funds)

103. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

104. During the period from at least 2019 to the present, Daniel Vorcaro, Mineiro, PS-MGG, as well as others, knowingly and willfully conspired and agreed among themselves to dissipate Banco Master's assets and breach fiduciary duties owed by Daniel Vorcaro to Banco Master, including by engaging in the Gulfstream Transfers for which Banco Master received virtually nothing in return.

105. The conspiracy's objectives were to: (a) defraud Banco Master; (b) aid and abet Vorcaro and/or his co-conspirators in breaching their fiduciary duties owed to Banco Master, (c) orchestrate the Gulfstream Transfers in order to acquire the Gulfstream and subsequently sell the Gulfstream, and (d) to unjustly enrich Vorcaro and PS-MGG at the expense of Banco Master, the Debtors, and their creditors.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against the Defendant for monetary damages sufficient to compensate Banco Master for the injuries resulting from Defendants' illicit acts in violation of Brazilian law as alleged herein up to the amount of the Subject Funds, together with pre- and post- judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper.

**COUNT IX**

**UNJUST ENRICHMENT UNDER [GEORGIA LAW]**
(Against PS-MGG Up to the Amount of the Subject Funds)

106. The Liquidator re-alleges and incorporates paragraphs 1 through 71 above as though set forth fully herein.

107. PS-MGG received the beneficial acquisition of the Gulfstream from the Gulfstream Transfers and in exchange for these transfers, PS-MGG provided little or no value to Banco Master.

108. By receiving hundreds of millions of Brazilian Reais from Banco Master in exchange for nothing or virtually worthless assets in return, PS-MGG was enriched at the expense of Banco Master.

109. As a result of the Gulfstream Transfers, Funds dissipated from Banco Master were used to purchase the Gulfstream and enable PS-MGG to then procure a sale of the Gulfstream.

110. The benefit conferred upon the Defendant is at the expense of Banco Master and to its detriment in that Banco Master has been deprived of the possession and use of its funds to which it is entitled.

111. By accepting the funds derived from the Gulfstream Transfers, the Defendant was aware of the benefit conferred upon it and continues to retain that benefit under circumstances that make its retention inequitable.

112. The Defendant knew or should have known that they had no entitlement to the benefit conferred upon them by Banco Master as a result of the Gulfstream Transfers.

113. The Defendant knew or should have known that the benefit it received was at the expense of Banco Master.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Defendant for compensatory damages equal to the value of the Subject Funds unjustly conferred upon the Defendant as alleged herein, pre- and post- judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper.

Dated: October 2, 2026

Respectfully submitted,
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
edavis@sequorlaw.com
fmenendez@sequorlaw.com
jmendoza@sequorlaw.com
mhanlon@sequorlaw.com
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

By: */s/ Juan J. Mendoza*
Edward H. Davis, Jr.
Florida Bar No.: 704539
Fernando J. Menendez
Florida Bar No.: 18167
Juan J. Mendoza
Florida Bar No.: 113587
Michael D. Hanlon
Florida Bar No.: 1068478