UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re: Case No.: 25-24568-SMG

BANCO MASTER S.A., BANCO LETSBANK S.A., BANCO MASTER DE INVESTIMENTO S.A., and MASTER S/A CORRETORA DE CÂMBIO, TÍTULOS E VALORES MOBILIÁRIOS,

Chapter 15

Debtor in a Foreign Proceeding
_________________________________________/

EFB REGIMES ESPECIAIS DE EMPRESAS LTDA., in its capacity as extrajudicial liquidator of the Debtors,

Plaintiff,

v. Adv. Case No. ____________

CLEAR RIVER PROPERTIES LLC and GOLDBEACH PROPERTIES LLC,

Defendants.
_________________________________________/

**COMPLAINT**

EFB Regimes Especiais de Empresas Ltda., represented by Eduardo Felix Bianchini, in its capacity as extrajudicial liquidator (the "Liquidator") of Banco Master S.A., Banco LetsBank S.A., Banco Master de Investimentos S.A., and Master S/A Corretora de Câmbio, Títulos e Valores Mobiliários (collectively, the "Debtors"), hereby sues Clear River Properties LLC ("Clear River")

and Goldbeach Properties LLC ("Goldbeach") (collectively, the "Defendants") and alleges as follows:

**THE PARTIES, JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O).

2. In the alternative, this matter is a related proceeding under 28 U.S.C. § 157(c)(1).

3. Venue is proper in this district under 28 U.S.C. § 1409.

4. Plaintiff EFB Regimes Especiais de Empresas Ltda. is a Brazilian company, acting in its capacity as extrajudicial liquidator of the Debtors.

5. On January 8, 2026, the Court entered an Order granting recognition of the Debtors' liquidation proceeding pending before the Central Bank of Brazil (Banco Central do Brasil) ("BACEN") under proceeding number 285696 (the "Brazilian Insolvency Proceeding") and acknowledging the Liquidator as the Debtors' foreign representative under 11 U.S.C. §§ 1515 and 1517 (the "Recognition Order"). *In re Banco Master et al.*, Case No.: 25-24568 (Bankr. S.D. Fla. Jan. 8, 2026), ECF No. 23. The Recognition Order empowers the Liquidator with the full administration and realization of all or part of the Debtors' assets within the territorial jurisdiction of the United States. *Id.*

6. Defendant, Clear River, is a limited liability company organized under the laws of Delaware that purchased the property at 600 Owl Creek Ranch Rd, Aspen, CO 81611 (the "Clear River Property").

7. Defendant, Goldbeach, is a limited liability company organized under the laws of Delaware that purchased the properties at 4430 Sabal Palm Road, Miami, Florida and 4425-45 Sabal Palm Rd, Miami, FL 33137 (the "Goldbeach Properties").

## FACTS

***The Debtors' Liquidations***

8. The Debtors are financial institutions organized under the laws of Brazil. Banco Master began operations in 1974, under the name Banco Maxima.

9. During the 2010s, Banco Maxima experienced a prolonged period of financial distress. Investigations resulted in the disqualification of its former controllers and administrators, who in 2018 transferred control of Banco Maxima to Daniel Bueno Vorcaro ("Vorcaro") to restructure and revitalize the bank. BACEN approved the transaction in 2019.

10. At all relevant times, Vorcaro was the President and indirect majority shareholder of Banco Master.

11. Vorcaro rebranded Banco Maxima as Banco Master in 2021 and implemented a restructuring plan to capitalize Banco Master through the issuance of Certificates of Deposit ("CDs") that offered above-market, inflated returns. Initially, this strategy seemed very successful, leading to record growth by Banco Master in 2023 and 2024.

12. In 2025, BACEN's investigations into Banco Master revealed irregularities relating to the use of the funds raised from the issuance of CDs and the funds deposited by the bank's account holders, including questions as to the destination of such funds. These investigations led to the conclusion that at least part of the funds invested through the issuance of the CDs and funds deposited by account holders had been illicitly dissipated.

13. BACEN's investigations led to (i) the entry of the orders placing Banco Master and the other Debtors in an extrajudicial liquidation, and (ii) the entry of the Freeze Orders (as defined below) as to Vorcaro and other shareholders, administrators, and executives of Banco Master and its affiliates.

14. On November 17, 2025, Vorcaro was arrested by the Brazilian Federal Police on suspicion of committing a R$ 12.2 billion fraud against the Brazilian financial system. He was released on November 28, 2025, on the condition that he be required to wear an electronic ankle bracelet while the ongoing investigation against him continued.

15. On November 18, 2025, BACEN ordered the extrajudicial liquidation of the Debtors and appointed the Liquidator to serve as the extrajudicial liquidator of the Debtors pursuant to Ato do Presidente Nos. 1.369, 1.371, 1.372, and 1.373.

16. In connection with the Brazilian Insolvency Proceeding, BACEN entered orders No. 44.234, No. 44.236, No. 44.237, No. 44.238, and No. 44.825 as to each of the Debtors (collectively, the "Freeze Orders"), which froze and/or prohibited certain of the Debtors' former shareholders, executives, and administrators, including Vorcaro, from selling and/or disposing of their assets.

***The Chapter 15 Case***

17. On December 10, 2025, the Liquidator filed a Petition for recognition of the Debtors' Brazilian Liquidation as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 1501 *et seq. In re Banco Master, et al.*, No. 25-24568-SMG (Bankr. S.D. Fla. Dec. 10, 2025), ECF Nos. 1-2.

18. On January 8, 2026, the Court entered the Recognition Order granting recognition of the Debtors' Brazilian Liquidation as a foreign main proceeding and acknowledging the Liquidator as the "foreign representative." *Id.*, ECF No. 23.

19. Among other things, the Recognition Order entrusted the Liquidator with the full administration and realization of all or part of the Debtors' estates and assets within the territorial jurisdiction of the United States. *Id.*, ECF No. 23.

20. On March 4, 2026, the Brazilian Supreme Court ordered that Vorcaro be re-arrested due to the discovery of his involvement in continued criminal activity in connection with the Banco Master fraud while he was subject to ongoing electronic monitoring, including the concealment of billions in assets in the name of third parties, hiding more than 2 billion reais with companies known for laundering money from the most dangerous criminal organizations in Brazil, and issuing direct orders for others to hack into the computer systems of individuals involved in the investigations, including law enforcement, and to engage in various acts of intimidation against a number of individuals, including business competitors, former employees, journalists, all of which would be seen as harmful to the interests of the organization, with a view to obstructing justice.

***Daniel Vorcaro's Use of Investment Funds and the Debtors' Wholly-Owned Companies and Investment Funds to Effectuate the Fraudulent Scheme***

21. Vorcaro and his co-conspirators employed a complex scheme to conceal the dissipation of tens of billions of Brazilian Reais (well over US$ 2 billion)[1] from the Debtors using Brazilian investment funds owned and/or controlled by the Debtors, Vorcaro, and related third parties, and companies and offshore structures owned and/or controlled by Vorcaro and his co-conspirators (the "Intermediary Entities").

22. In one iteration of the fraudulent scheme, Vorcaro would cause Banco Master to transfer monies to a Brazilian investment fund that he directly or indirectly controlled (each, a "Fund") for the stated purpose of acquiring interests (or "quotas") in the Fund.

23. In turn, the Fund would transfer the monies obtained from Banco Master (through one or more subsequent transactions) to purchase "assets" that had little or no value ("Junk

[1] Please note, the investigations remain ongoing to determine the full scope of the amount diverted from the Debtors, which may result in this amount increasing significantly due to a reported $18 billion reais shortfall in the capital of Banco Master.

Assets") from entities or parties that were (i) controlled by and/or were alter egos of Vorcaro or (ii) participants in the fraud.

24. In another iteration of the fraudulent scheme, Vorcaro and his co-conspirators effectuated a similar fraud through which Vorcaro would cause Banco Master to transfer monies to acquire receivables that had no significant value for prices many times higher, such that Banco Master funds would be transferred to entities that Vorcaro and/or his conspirators controlled.

25. The purpose of these transactions was to, among other things, (i) transfer the Debtors' assets for no significant value and (ii) conceal such transfers by disguising the dissipation of funds as the acquisition of "assets" on the Debtors' books and records that, in reality, had little or no value.

***The Mosaic Short Duration Fund***

26. One specific structure created and employed by Vorcaro and his co-conspirators to dissipate Banco Master's assets involved the Mosaic Short Duration Fund, Ltd. SAC (the "Mosaic Short Duration Fund"), a Bahamian mutual fund situated at the West Bay Street, P.O. Box SP-6377 1, New Providence, The Bahamas.

27. Upon information and belief, the Mosaic Short Duration Fund, which was formed in September of 2020, was created to hold and/or further transfer funds that had been unlawfully and fraudulently dissipated from Banco Master. Specifically, as part of this scheme, funds dissipated from Banco Master were routed through a series of entities controlled by and operating for the benefit of Vorcaro and his co-conspirators and were ultimately transferred to the Mosaic Short Duration Fund, which would then further transfer and/or deploy those funds through a variety of fraudulent transactions for the ultimate benefit of Mr. Vorcaro and his co-conspirators.

28. Upon information and belief, the purpose of the Mosaic Short Duration Fund was to hold funds obtained from the fraudulent scheme against Banco Master, conceal the source of

those funds, and otherwise launder the proceeds through transactions (including transactions resulting in transmission of funds by means of wire transfers in interstate or foreign commerce that resulted in the transfer of millions in laundered funds into the United States) that were designed to appear legitimate, but lacked any economic substance, and, in many instances, allowed Mr. Vorcaro to directly benefit from the use of those improperly diverted assets.

29. In furtherance of the foregoing scheme, in the less than three-year period from April 2024 through October 2025, Mosaic Short Duration Fund received more than USD $430,000,000.00 in funds that were improperly dissipated from Banco Master (much of which was further dissipated via transfers using U.S. bank accounts). [redacted], an entity nominally controlled by Mr. Vorcaro's co-conspirator, Antônio Carlos Freixo Júnior—who was recently reported to have entered into a plea agreement with Brazilian authorities relating to criminal claims surrounding the Banco Master fraud—as intermediaries, are discussed in greater detail below.

***Entities Funding the Mosaic Short Duration Fund***

30. Mosaic Short Duration Fund was capitalized through a series of transactions involving entities controlled by Vorcaro and his co-conspirators. Although the flow of funding varies, in one iteration of the funding of Mosaic Short Duration Fund, Vorcaro would cause Banco Master to make investments in Liquidity Strategies Fund Ltd., a Bahamian Fund ("Liquidity Strategies Fund"). Liquidity Fund would subsequently transfer the funds to OGP LatAM Investment Ltd. ("OGP"), another Bahamian investment fund. OGP is controlled by Antônio

Carlos Freixo Júnior ("Mineiro"). Mineiro is an agent of Vorcaro that has routinely acted as Vorcaro's strawman in the various iterations of the scheme to dissipate funds from Banco Master.[2]

31. Mineiro, at Vorcaro's behest, would then cause funds held at OGP to be transferred to Entre Investments and Arbitrage Ltd. ("Entre Arbitrage"), another Mineiro entity organized as a Fund under the laws of Bahamas. From there, the proceeds would then be transferred to Mosaic Short Duration Fund's bank account located at the Bank of New York Mellon in the name of Mosaic Financial Ltd., account number XXX3349 for further credit ("FFC") to Mosaic Financial Client Account number XXX8400, and were ultimately part of the funds loaned to Mosaic Group pursuant to the Loan Agreement (as defined below) and used to acquire the Clear River and Goldbeach Properties.

32. However, in other instances, the dissipation scheme involved fewer intermediary entities. For example, some transactions involved a transfer from Banco Master to [redacted], followed by a transfer to Entre Arbitrage, which, after a currency exchange transfer with another bank, would in turn transfer those funds to Mosaic Short Duration Fund. The specific mechanics and transfers of the scheme are further explained below.

***The Entre Investimentos e Participações Ltda. and Entre Investments and Arbitrage Ltd. Structure***

33. Entre Investments and Arbitrage Ltd. is an entity employed by Vorcaro and his co-conspirators to dissipate Banco Master's assets. Entre Arbitrage is beneficially owned and controlled by Mineiro. Entre Arbitrage is an affiliated entity of Entre Investimentos e Participações Ltda., a company incorporated under the laws of Brazil. Entre Investimentos is, at least formally,

[2] Upon information and belief, Mineiro entered into a plea bargain with Brazilian Federal Police in September 2026 for his involvement in the Banco Master fraud.

wholly owned by Cactus Assessoria e Serviços Ltda., a company whose alleged purpose included financial advisory services and asset management, which is controlled by its partner, Mineiro. Entre Investimentos and Entre Arbitrage were regularly used in the funding of Mosaic Short Duration Fund.

34. In fact, through the course of the Liquidator's investigations, the Liquidator has uncovered information regarding the existence of offshore trust structures established for the benefit of Vorcaro, wherein Mineiro appears to have directly participated in the transfer of funds to sustain these entities. For example, Mineiro allegedly transferred USD $5,000,000 into Mosaic Financial Ltd., an asset management company which used to manage Vorcaro's assets, intending to maintain the assets of these structures for the benefit of Vorcaro. Of these USD $5,000,000, a portion equivalent to USD $1,000,000 was to be allocated to a trust for the benefit of Vorcaro and another USD $1,000,000 for the payment of credit card expenses incurred personally by Vorcaro.

35. As part of the ongoing fraud, [redacted].

***The Fraudulent Dissipation of Funds from Banco Master to Mosaic Short Duration Fund***

36. The Liquidator's investigations have revealed that (i) Vorcaro is the ultimate beneficial owner of the Mosaic Short Duration Fund structure and all the assets underlying it, and (ii) Clear River and Goldbeach were merely vehicles used by Vorcaro and his co-conspirators,

including but not limited to Mineiro, for the acquisition of high-end real estate assets. Altogether, the Clear River and Goldbeach Properties were acquired for over $168,000,000. Vorcaro not only participated directly in the negotiations to acquire these properties, but used them as his personal residences and oversaw their renovations, decoration, and design, and hired the professionals rendering services relating to the same.

37. Defendants did not fund the acquisition of the Clear River and Goldbeach properties with their own assets nor via legitimate business transactions; rather, the purchases were financed entirely from funds fraudulently siphoned from Banco Master through a series of transfers through Intermediary Entities which served as mere conduits for the benefit of Defendants and Vorcaro. Consistent with this scheme, the following transfers were made:

38. Upon information and belief, on or before February 17, 2023, Vorcaro caused Banco Master to make transfers of USD $187,450,000 to the Liquidity Strategies Fund, which then transferred USD $112,800,000 of those funds to OGP. Upon information and belief, on February 17, 2023, OGP transferred USD $24,000,000 to Entre Arbitrage, which immediately transferred that same amount to Mosaic Short Duration Fund on that same day.

39. Upon information and belief, between April 3, 2024 and April 8, 2024, Vorcaro caused [redacted]. On the same day that it received each of the foregoing transfers, [redacted]. Upon information

and belief, on April 8, 2024, approximately USD $27,802,195.71 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. Additionally, upon information and belief, on April 9, 2024—the same day as the so-called "Loan Agreement" between the Mosaic Short Duration Fund and Mosaic Group (discussed further below)—an additional USD $47,000,000 million was transferred to Entre Arbitrage, which was sourced from the fraud against Banco Master and transferred from Mineiro-controlled OGP. The aforementioned series of transfers culminated in a USD $76,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on April 9, 2024.

40. Upon information and belief, on May 29, 2024, an additional USD $45,807,347.92 dissipated from Banco Master and transferred from OGP, was transferred to Entre Arbitrage, and on the same day, further transferred by Entre Arbitrage transferred in its entirety to the Mosaic Short Duration Fund.

41. Upon information and belief, on July 29, 2024, Vorcaro caused [redacted]. Upon information and belief, on July 30, 2024, approximately USD $19,815,565.14 from such transfers was then transferred from Entre Investimento to Entre Arbitrage and immediately transferred by Entre Arbitrage to the Mosaic Short Duration Fund on that same day.

42. Upon information and belief, on August 15, 2024, Vorcaro caused [redacted]

[redacted]. Upon information and belief, on August 15, 2024, USD $20,000,000 from such transfers was then transferred from Entre Investimento to Entre Arbitrage, which were then immediately transferred by Entre Arbitrage to Mosaic Short Duration Fund on the next day, August 16, 2024.

43. Upon information and belief, on August 20, 2024, Vorcaro [redacted]. Upon information and belief, on August 21, 2024, approximately USD $9,934,949.65 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $9,934,949.65 transfer from Entre Arbitrage to Mosaic Short Duration Fund on August 21, 2024.

44. Upon information and belief, on September 12, 2024, Vorcaro caused [redacted]. Upon information and belief, on September 13, 2024, approximately USD $10,000,000 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $10,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on September 16, 2024.

45. Upon information and belief, on September 26, 2024, Vorcaro caused [redacted]. Upon information and belief, on September 27, 2024, approximately USD $14,533,633.21 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $14,533,633.21 transfer from Entre Arbitrage to Mosaic Short Duration Fund on September 30, 2024.

46. Upon information and belief, on October 2, 2024, Vorcaro caused [redacted]. Upon information and belief, on October 2, 2024, approximately USD $10,000,000 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $9,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on October 3, 2024.

47. Upon information and belief, on October 16, 2024, Vorcaro caused [redacted]

Upon information and belief, on October 17, 2024, approximately USD $20,000,000 from such

transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $8,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on October 18, 2024.

48. Upon information and belief, on December 4, 2024, Vorcaro caused [redacted]. Upon information and belief, on that same day, the entirety of the amount (approximately USD $32,304,160.18) from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $29,274,854.32 transfer from Entre Arbitrage to Mosaic Short Duration Fund on the next day, December 6, 2024.

49. Upon information and belief, on January 2, 2025, Vorcaro caused [redacted]. Upon information and belief, on that same day, the entirety of the amount (approximately USD $48,138,701.69) from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $32,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on January 3, 2025.

50. Upon information and belief, between January 9, 2025 and January 20, 2025, Vorcaro caused [redacted]. Upon information and belief, between January 10, 2025 and January 21, 2025, approximately USD $42,451,372.35 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers was immediately followed by a USD $51,500,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on the next day, January 22, 2025.

51. Upon information and belief, on February 3, 2025, Vorcaro caused [redacted]. Upon information and belief, on that same day, the entirety of the amount (approximately USD $11,177,383.36) from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in a USD $8,500,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on February 5, 2025.

52. Upon information and belief, between April 8, 2025 and October 23, 2025, Vorcaro caused [redacted]. Upon information and belief, between April 9, 2025 and October 23, 2025, approximately USD $79,658,040.91 from such transfers was then transferred from Entre Investimento to Entre Arbitrage. The aforementioned series of transfers culminated in and were followed by a USD $75,000,000 transfer from Entre Arbitrage to Mosaic Short Duration Fund on October 28, 2025.

53. Upon information and belief, in the less than three-year period from February 2023 through October 2025, Mosaic Short Duration Fund received more than USD $430,000,000.00 in funds that were improperly dissipated from Banco Master pursuant to the foregoing transfers, portions of which were further transferred in connection with the scheme to acquire real property for Vorcaro's benefit through the use of Defendants Clear River and Goldbeach, as more specifically set forth below.

***The Jaguar Structure's Funding of Mosaic Short Duration Fund***

54. Separate from the Entre structure discussed above, another group of interrelated entities controlled by Vorcaro, referred to herein as the "Jaguar Entities", participated in the funding of Mosaic Short Duration Fund. Upon information and belief, the Jaguar Entities structure likewise involved funds originating at Banco Master and were wrongfully dissipated for the benefit of Vorcaro.

55. In this iteration of the scheme, funds that, upon information and belief, were held at Banco Master were wrongfully dissipated and transferred to Jaguar Multimarket Fund Ltd., a segregated portfolio company formed under the laws of the Cayman Islands ("Jaguar Cayman"). Jaguar Cayman is controlled by Benjamin Botelho de Almeida ("Botelho"), another high-level co-conspirator and agent of Vorcaro that acted at Vorcaro's direction. Jaguar Cayman would in turn transfer the funds to Phoenix Multimarket Fund, Ltd., a Bahamian fund controlled by Botelho ("Phoenix") pursuant to subscription agreements for the purchase of shares in the fund. Phoenix would then transfer the funds to Mosaic Short Duration Fund pursuant to share subscription agreements. The Liquidators' investigation has found the following transfers occurred in furtherance of this scheme, and upon information and belief, all relevant Jaguar Cayman funds were dissipated from Banco Master.

56. On February 5, 2024, Jaguar Cayman transferred $11,000,000 from its Mosaic account #XXX7001 to Phoenix's Mosaic account #XXX8400 pursuant to a subscription agreement. On the same day, Botelho authorizes Phoenix to invest $11,000,000 from its Mosaic account #XXX8400 to Mosaic Short Duration Fund's account #XXX6002 at BNYM pursuant to a subscription agreement.

57. The pattern set forth in the previous paragraph is repeated on February 21, 2024. On that day, Jaguar Cayman transferred $6,000,000 from its Mosaic account #XXX7001 to Phoenix's Mosaic account #XXX8400 pursuant to a subscription agreement. On the same day, Botelho authorizes Phoenix to invest $6,000,000 from its Mosaic account #XXX8400 to Mosaic Short Duration Fund's account #XXX6002 at BNYM pursuant to a subscription agreement.

58. Upon information and belief, the funds routed through this structure (the "Jaguar Structure"), were used to acquire real property for Vorcaro's benefit through the use of Defendants Clear River and Goldbeach, as more specifically set forth below.

***The Purchase of the Gold Beach and Clear River Properties with Funds from Mosaic Short Duration Fund***

59. Upon information and belief, funds improperly transferred to the Mosaic Short Duration Fund through the aforementioned transfers were then further transferred by the Fund through sham transactions (designated as loans) that were intended to allow the nominal borrower, Mosaic Group LLC, to use the funds transferred by Mosaic Short Duration Fund to, among other things, purchase luxury real estate and fund improvements to those properties for Mr. Vorcaro's beneficial ownership and personal use.

60. In furtherance of the foregoing scheme, on or about April 9, 2024, the Mosaic Short Duration Fund, as the putative "Lender", entered into a Loan Agreement (the "Loan Agreement") with Mosaic Group LLC, as the putative "Borrower" ("Mosaic Group"), pursuant to which Mosaic Short Duration Fund agreed to loan up to USD $350,000,000.00 to Mosaic Group for (as explained in the one-sentence description provided in Section 1.5 of the Agreement) "investment purposes."

61. The loan proceeds received by Mosaic Group, which, upon information and belief, are traceable to funds improperly transferred from Banco Master to the Mosaic Short Duration Fund (as discussed above), were further transferred by Mosaic Group to allow Defendants Clear

River and Goldbeach—both of which are nominally wholly-owned by Mosaic Group—to acquire and make improvements to luxury real estate in the United States for Vorcaro's personal benefit.

62. Specifically, on April 11, 2024, Clear River Properties LLC acquired the property at Owl Creek, located at 600 Owl Creek Ranch Road, Aspen, Colorado, for a contract sales price of $77,000,000. The acquisition was completed without mortgage financing.

63. Upon information and belief, the acquisition of the Clear River Property was funded by Mosaic Group with funds transferred by Mosaic Short Duration Fund, which were obtained from the Banco Master fraud. Specifically, upon information and belief, the purchase was funded through the use of the USD $76,000,000 transferred by Entre Arbitrage to Mosaic Short Duration Fund on April 9, 2024, which, upon information and belief, was subsequently transferred to Mosaic Group pursuant to the Loan Agreement executed on that same date, and subsequently transferred by Mosaic Group to close on the purchase of the Clear River Property. Notably, though dated as of April 9, 2024, the Loan Agreement was supported by a pledge of the Clear River Property, which was then in the process of being acquired through the "borrowed" funds.

64. In addition to the foregoing, the Liquidator has identified additional transfers of USD $29,832.797.00 to accounts held by Clear River, which, upon information and belief, were also funded by Mosaic Group with tainted funds obtained from the Loan Agreement with Mosaic Short Term Fund, including the following:

i. On April 11, 2024, Clear River opened a checking account with Acct. No. XXX6259 at JPMorgan Chase (the "Clear River Chase Account"), which was funded with a deposit of $1,000,000 via a Fedwire Credit from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX9921]" (an account believed to be tied to Mosaic Group), with a

reference for "BNF of Clear River Properties LLC "Obi = Short Duration Fund Z Clear River Properties/Owl Creek Investment";

ii. Between April 2024 and March 2026, Clear River received further transfers of $24,332,797 from the same Mosaic Financial Client Acct XXX9921, which are believed to have been transferred to fund construction expenses and improvements on the Clear River Property;

iii. On March 11, 2026, Clear River's bank account at Timberline Bank in Aspen, Colorado, received an additional $5,500,000 from the same Mosaic Financial Client Acct XXX9921;

iv. On June 18, 2024, Clear River received a Fedwire Credit for $1,000,000 from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC "Obi = Short Duration Fund Z Clear River Properties/Owl Creek Investment…House Remodel";

v. On September 10, 18, and 19, 2024, Clear River received three (3) Fedwire Credits totaling $4,250,000 in aggregate from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC;

vi. On February 6, 2025, Clear River received a Fedwire Credit for $2,000,000 from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC;

vii. On July 22, 2025, Clear River received a Fedwire Credit for $2,000,000 from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC;

viii. On November 6, 12, and 20, 2025, Clear River received three (3) Fedwire Credits totaling $3,082,797 in aggregate from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC;

ix. On December 24 and 30, 2025, Clear River received two (2) Fedwire Credits totaling $6,000,000 in aggregate from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC;

x. On January 28, 2026, Clear River received a Fedwire Credit for $4,000,000 from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC; and

xi. On February 20, 2026, Clear River received a Fedwire Credit for $1,000,000 from the Bank of New York Mellon by order of "Mosaic Financial Client Acct [XXX]9921" for BNF of Clear River Properties LLC.

65. The transfers identified at paragraphs 62 through 64 above, including those relating to the acquisition of the Clear River Property, all of which upon information and belief were fraudulently sourced from funds improperly diverted from Banco Master, are collectively referred to herein as the "Clear River Transfers".

66. In addition to the Clear River Transfers, Vorcaro also used the foregoing scheme to fund the acquisition of the Goldbeach Properties.

67. Specifically, on January 7, 2025, Goldbeach Properties acquired a large bayfront property located at 4425-4445 Sabal Palm Road, Miami, Florida for a contract sales price of $85,200,000.

68. Shortly thereafter, on February 10, 2025, Goldbeach acquired the property at 4430 Sabal Palm Road, Miami, Florida, which is located across the street from the 4425-4445 Sabal Palm Road bayfront property—for a contract sales price of $6,900,000.

69. Like the Clear River Property, both of the Goldbeach Properties were acquired in cash and without mortgage financing. Upon information and belief, all of the transfers made to acquire and/or improve the Goldbeach Properties were transferred from Mosaic Group and came from proceeds provided by the Mosaic Short Duration Fund, which (as discussed) were obtained from Banco Master fraud with the cooperation of Vorcaro's co-conspirators.

70. In particular, the Liquidator has identified USD $113,649,281.23 in the following transfers made from the Mosaic Financial Client Acct. [XXX]9921, which were used to fund USD $87,599,281 to close on the Goldbeach's acquisition of the 4425-4445 Sabal Palm Road, and an additional USD $26,050,000, which, upon information and belief, were used to fund other expenses related to that property:

i. On September 30, 2024, Goldbeach received a transfer of $550,000 from Mosaic Financial Client Acct XXX9921 via BNYM, which was deposited into Goldbeach's checking account with Acct. No. XXX9533 at JPMorgan Chase (the "GBP JPMC Acct."). Notably, on the same day, the $500,000 was transferred to Global America Title Services LLC ("Global America") in Hollywood FL, the [closing agent] for the sale of the Goldbeach

Properties, as the first deposit for the acquisition of "4425 4445 Sabal Palm Road";

ii. On October 17, 2024, Mosaic Financial Client Acct XXX9921, as "Originator", made a transfer of US$8,000,000.00 for the Account XXX0084 in the name of Global America, which referenced "Goldbeach Properties LLC" and was made as the second deposit for the acquisition of the 4425-4445 Sabal Palm Road. On that same day, Global America confirmed that it had received the first and second deposits and was holding the total of USD $8,500,000 in "escrow for 4425 & 4445";

iii. On December 12, 2024, Mosaic Financial Client Acct XXX9921, as "Originator", made a transfer of US $25,000,000.00 for the Account XXX0084 in the name of Global America, which referenced "Goldbeach Properties LLC." On that same day, Global America confirmed that it had received the additional funds and was now holding a total of USD $33,500,000 in "escrow for 4425 & 4445." Notably, and as discussed at paragraph 48 above, the amount corresponds to a total of more than US $29,000,000 which was dissipated from Banco Master and transferred to the Mosaic Short Duration Fund on December 6, 2024, just prior to this transfer;

iv. On January 6, 2025, Mosaic Financial Client Acct [XXX]9921, as "Originator", made a transfer of US $54,599,281.23 for the Account XXX0084 in the name of Global America, which referenced "Goldbeach Properties LLC." A November 14, 2025, "Landtech Receipt/Check

Disbursement Statement" relating to the sale of the 4425-4445 Sabal Palm Road confirmed the receipt of this amount and all other amounts referenced above, and the use of those funds to close on Goldbeach's purchase of that property. Notably, and as discussed at paragraphs 48 and 49 above, the amount closely corresponds to a total of approximately US $61,000,000 which was dissipated from Banco Master and transferred to the Mosaic Short Duration Fund from December 4, 2024 through January 3, 2025, just prior to this transfer;

v. In addition to the foregoing, and after the January 7 closing, on January 22, 2025, Goldbeach received an additional USD $25,500,000 in transfers to its GBP JPMC Acct., as follows:

a. On January 22, 2025, $500,000 from Mosaic Financial Client Acct XXX9921 via BNYM;

b. On February 12, 2025, $500,000 from Mosaic Financial Client Acct XXX9921 via BNYM;

c. On September 16, 2025, $3,500,000 from Mosaic Financial Client Acct XXX9921 via BNYM;

d. On December 30, 2025, $5,000,000 from Mosaic Financial Client Acct XXX9921 via BNYM;

e. On January 28, 2026, $10,000,000 from Mosaic Financial Client Acct XXX9921 via BNYM;

f. On February 20, 2026, $500,000 from Mosaic Financial Client Acct XXX9921 via BNYM; and

g. On March 23, 2026, $5,500,000 from Mosaic Financial Client Acct XXX9921 via BNYM.

71. The transfers identified at paragraph 70 above, all of which, upon information and belief, were fraudulently sourced from funds improperly diverted from Banco Master, are collectively referred to herein as the "First Sabal Palm Transfers".

72. In addition to transfers relating to 4425-4445 Sabal Palm Road, the Liquidator has identified an additional USD $6,895,576.14 in transfers (the "Second Sabal Palm Transfers" and, together with the First Sabal Palm Transfers, the "Goldbeach Transfers"), which were used to fund Goldbeach's acquisition of the 4430 Sabal Palm Road property as follows:

i. On December 9, 2024, Mosaic Financial Client Acct XXX9921, as "Originator", made a transfer of USD $100,000.00 for the Account XXX0084 in the name of Global America, which referenced "Goldbeach Properties LLC/4430 Sabal Palm" and was made as the first deposit for the acquisition of the 4430 Sabal Palm Road;

ii. On December 13, 2024, Mosaic Financial Client Acct XXX9921, as "Originator", made an additional transfer of USD $590,000.00 for the Account XXX0084 in the name of Global America, which referenced "Goldbeach Properties LLC/4430 Sabal Palm" and was made as the first second deposit for the acquisition of the 4430 Sabal Palm Road. On that same day, Global America confirmed that it had received the first and second Deposits and was holding the total of USD $690,000 in "escrow for 4430"; and

iii. On February 7, 2025, Mosaic Financial Client Acct XXX9921, as "Originator", made two separate transfers in the amount of (1) US $6,200,071.90 and (2) US $5,504.24 for the Account XXX0084 in the name

of Global America, each of which referenced "Goldbeach Properties LLC." An April 28, 2025, "Landtech Receipt/Check Disbursement Statement" relating to the sale of the 4430 Sabal Palm Road property confirmed the receipt of the foregoing amounts and all other amounts referenced above, and the use of those funds to close on Goldbeach's purchase of that property.

73. Upon information and belief, (i) the transfers made to Mosaic Group pursuant to the so-called Loan Agreement and (ii) the subsequent transfers from Mosaic Group, which were made to or for the benefit of Defendants Clear River and Goldbeach, were made in furtherance of a scheme to dissipate funds improperly and fraudulently dissipated from Banco Master with the actual intent to hinder, delay, and defraud Banco Master and its creditors, including to allow Mr. Vorcaro to personally benefit from the use of those funds.

74. This belief is supported by, among other things, the following:

i. The Loan Agreement provides for the transfer of $350 million to an entity, Mosaic Group, which does not appear from the loan documents to have had any assets or business operations other than those received from the Mosaic Short Duration Fund (and, indeed, was formed shortly prior to the Mosaic Short Duration Fund);

ii. Numerous very large transfers made in connection with the Clear River Transfers and the Goldbeach Transfers were made at or about the same time as known transfers involving the dissipation of funds to Mosaic Short Duration Fund, and all transfers identified were processed through the same

Mosaic Financial Client Acct XXX9921 that was used to effectuate those transactions, suggesting a common scheme and mechanism for funding;

iii. The Loan Agreement and various documents executed in connection therewith were signed by individuals, including Cira Davis (on behalf of Mosaic Short Duration Fund), and Brad Jensen and Lori Webb (on behalf of Mosaic Group), which, upon information and belief had knowledge of the ultimate purpose of the transactions and transfers at issue, as they either had personal ties to Vorcaro, personal involvement in the prior acquisition of other material assets on Vorcaro's behalf (which were also acquired through the use of funds held in third-party accounts at Mosaic), and/or ties to Bahamian-based Mosaic Financial Ltd. and/or certain of its affiliates, which at all relevant times maintained large accounts for numerous entities believed to be implicated in Vorcaro's fraud, including, for example, Jaguar Investments Horizon LLC, and knew that, Vorcaro was the beneficiary of these transactions, although he was not listed as an official member or beneficial owner of the Mosaic Short Duration Fund, Mosaic Group, or Defendants Clear River and/or Goldbeach;

iv. Indeed, Brad Jensen, who is listed as Chairman of Mosaic on the company's website, signed a personal letter of reference for Mr. Vorcaro, dated as of April 20, 2020, which vouched for Mr. Vorcaro's "integrity and honesty" to the Kodiak Trust Company, which, upon information and belief, subsequently became trustee of Mr. Vorcaro's family trust, *i.e.*, the Fortress Legacy Trust, which was funded largely through transfers made from

accounts maintained by entities associated with the fraud with Mosaic Financial. In addition, David Garff, who is listed as the CEO of Accuvest Global Advisors, an entity which upon information and belief is affiliated with Mosaic, also allowed Mr. Vorcaro to use a personal credit card that was in Mr. Garff's own name during the period in which Mr. Vorcaro was defrauding Banco Master, which Mr. Vorcaro used to make extravagant purchases, which (at times) exceeded $100,000 in a single month;

v. Similarly, Lori Webb, who is listed as a Partner and Client Director of Mosaic on the company's website, was keenly aware of the purpose of the transactions and structure created to facilitate Mr. Vorcaro's acquisition of the Clear River and Goldbeach Properties. Indeed, upon information and belief, both Clear River and Goldbeach (the entities used to acquire the properties at issue) were formed following requests made by Brad Jensen on behalf of Mr. Vorcaro, pursuant to which he asked representatives of Mr. Vorcaro's family trust, Kodiak Trust, to form each of the LLC's. Although the LLC's were immediately formed pursuant to a structure that provided for Clear River and Goldbeach to be wholly-owned by Bahamian limited companies, *i.e.*, Clear River Ltd. and Goldbeach Ltd., respectively, on February 29, 2024, Lori Webb contacted the Kodiak Trust to note that Mr. Vorcaro had been errantly listed as the owner of the limited companies and that the corporate documents should be corrected to instead list the Fortress Legacy Trust as the first member of each entity. Upon information and belief, this (much like allowing Mr. Vorcaro to use a credit card in Mr.

Garff's name) was done to conceal Mr. Vorcaro's involvement in the transactions as the real owner of the Clear River and Goldbeach Properties. Further, although the Clear River Property was already under a sale contract signed by Mr. Vorcaro as of March 20, 2024, that contract was assigned to Clear River after the company's formation. On March 26, 2024, Lori Webb forwarded a request to the Fortress Legacy Trust that the manager of Clear River be changed to her and that the shares of that LLC be transferred to Mosaic Group. Although Clear River already held contract rights to the Clear River Property, the transfer was made without any compensation to the Fortress Legacy Trust. Lori Webb was similarly involved in the change of management and the transfer of shares of Goldbeach, which occurred prior to the acquisition of the Goldbeach Properties.

vi. Additionally, Andreas Toth, an individual who, upon information and belief, has been employed by and/or has acted for Mosaic Financial and/or its affiliates, was listed by Lori Webb as a person authorized to act for Goldbeach in the company's application for registration with the State of Florida. Notably, Mr. Toth is known to have been personally involved as the agent for Vorcaro in the acquisition of assets for the benefit of Mr. Vorcaro, including multi-million dollar artworks purchased through the Fortress Legacy Trust, which he arranged to be acquired via fund transfers from non-Vorcaro-titled accounts at Mosaic.

vii. The Loan Agreement and supporting documents entered into in connection therewith do not reflect standard business terms suggestive of an arms'-

length transaction, as, among other things, it (a) does not require Mosaic Group to make any payment of principal or interest for seven (7) years, until April 9, 2031, and is subject to a further extension of one additional year at the discretion of the Mosaic Short Duration Fund, (b) provides for an immediate negative pledge of all assets of Mosaic Group, including its interest in the properties acquired by Clear River and Goldbeach, as a guaranty of obligations under the Loan Agreement, and prevents Mosaic Group from engaging in any unapproved conditional sale or lease of those properties prior to the payment of the loan (which, upon information and belief, Mosaic Group could not pay without selling the properties); (c) requires the market value of the properties to be no less than 1.2 times the amount owed on the loan at all times, and makes the failure to meet that condition an event of default that would allow the Mosaic Short Duration Fund to call a default at any time that it may be convenient to do so (as the Agreement requires the value of the properties to, at all times, exceed annual accrued (but unpaid) interest of 4%, plus 20%); and (d) despite long being in default for failure to meet the foregoing asset requirements, has not been enforced according to its terms;

viii. The funding provided for the acquisition of the Clear River Property and the Goldbeach Properties substantially coincided with the execution of long-term residential property leases, which gave Mr. Vorcaro, as lessee, the exclusive right to occupy each of the aforementioned properties, on which Vorcaro failed to make required lease payments;

ix. Vorcaro's long-term lease of the Clear River Property, which had an effective date of April 11, 2024 (*i.e.*, days after the Clear River Property was acquired) was on non-standard business terms, which gave him the right to occupy the luxury estate in Aspen, Colorado for a period of ten (10) years (a period exceeding the maturity date on the Loan Agreement), as well as an option to purchase the property at fair market value at the end of the lease term with a credit of 100% of any rent he paid over the lease term;

x. Vorcaro's long-term lease of the Goldbeach Property at 4445 Sabal Palm Road in Miami, Florida, which had an effective date of June 4, 2024, was on non-standard business terms, which gave him the right to occupy the luxury estate in Miami, Florida for a period of ten (10) years (a period exceeding the maturity date on the Loan Agreement), as well as an option to purchase the property at fair market value at the end of the lease term with a credit of the overwhelming majority (*i.e.*, 70% of the property's value) of the rent payments;

xi. Upon information and belief, Mr. Vorcaro's long-term leases—which provided Mosaic Group with little if any financial benefit from its nominal ownership of either property—have long been in default for non-payment (indeed, no evidence of any payment on either lease has yet to be found) and have never been enforced pursuant to their terms, as they are sham agreements designed to allow Mr. Vorcaro to reside in the properties purchased with assets siphoned from Banco Master; and

xii. Given that, upon information and belief, all revenue that could be obtained by Mosaic Group for the payment of the Loan Agreement was to come from the leases with Mr. Vorcaro, and that, upon information and belief, Vorcaro controls the Short Term Duration Fund and provided all funding for that entity through his co-conspirators, Mr. Vorcaro controls the properties acquired by Defendants Clear River and Goldbeach either through the leases, or, if he opts to default, by calling an event of default and having all pledged assets held by Mosaic Group—*i.e.*, the Clear River and Goldbeach Properties—go to the Short Term Duration Fund to be liquidated for his benefit.

75. As a result of the foregoing, the estate has claims against the Mosaic Short Duration Fund, Mosaic Group, and all other entities and individuals acting in conspiracy therewith, with respect to all transfers made by the Mosaic Short Duration Fund to Mosaic Group, which were subsequently fraudulently transferred to Defendants Clear River and Goldbeach.

**COUNT I**

**CONSTRUCTIVE TRUST AND EQUITABLE LIEN**
(Against Goldbeach Properties LLC regarding the Goldbeach Properties)

76. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

77. Goldbeach Properties LLC, through its intermediary payment processor, Mosaic Financial Ltd. ("Mosaic"), obtained the benefit of funds wrongfully siphoned from Banco Master through fraud and other illicit conduct, including the Goldbeach Transfers.

78. Upon information and belief, Goldbeach Properties LLC was unjustly enriched by obtaining the funds diverted from Banco Master and using certain of those funds to purchase the Goldbeach Properties.

79. Since the funds used by Mosaic for the benefit of Goldbeach Properties LLC did not rightfully belong to it, and Mosaic used the funds to acquire the Goldbeach Properties on behalf of Goldbeach Properties LLC, there was an implied promise that Goldbeach Properties LLC would return the Goldbeach Properties to Banco Master.

80. Instead, Goldbeach Properties LLC failed to return the Goldbeach Properties.

81. Goldbeach Properties LLC has been unjustly enriched by directing Mosaic to issue payment for the Goldbeach Properties, for acquiring the Goldbeach Properties, and continuing to own the Goldbeach Properties.

82. Banco Master has no adequate remedy at law.

83. Upon information and belief, the Goldbeach Properties constitutes identifiable proceeds of the misappropriated funds from Banco Master and is held by Goldbeach Properties LLC in constructive trust for Banco Master.

84. A constructive trust on the Goldbeach Properties is necessary so that Goldbeach Properties LLC will not dispose of the Goldbeach Properties, which are due and owing to Banco Master.

85. Alternatively, in view of the diversion of the funds from Banco Master by Vorcaro and his co-conspirators, general considerations of right and justice demand that an equitable lien be placed on the Goldbeach Properties.

WHEREFORE, the Liquidator requests that the Court impose a constructive trust on the Goldbeach Properties in favor of Banco Master, or in the alternative, an equitable lien on the

Goldbeach Properties in favor of Liquidator on behalf of Banco Master. The Liquidator further requests any other and further relief that the Court deems just and proper.

## COUNT II

### CONSTRUCTIVE TRUST AND EQUITABLE LIEN
(Against Clear River Properties LLC regarding the Clear River Property)

86. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

87. Upon information and belief, Clear River Properties LLC, through its intermediary payment processor, Mosaic Financial Ltd. ("Mosaic"), obtained the benefit of funds wrongfully siphoned from Banco Master through fraud and other illicit conduct, including the Clear River Transfers.

88. Upon information and belief, Clear River Properties LLC was unjustly enriched by obtaining the funds diverted from Banco Master and using certain of those funds to purchase the Clear River Property.

89. Since the funds used by Mosaic for the benefit of Clear River Properties LLC did not rightfully belong to it, and Mosaic used the funds to acquire the Clear River Property on behalf of Clear River Properties LLC, there was an implied promise that Clear River Properties LLC would return the Clear River Property to Banco Master.

90. Instead, Clear River Properties LLC failed to return the Clear River Property.

91. Clear River Properties LLC has been unjustly enriched by directing Mosaic to issue payment for the Clear River Property, for acquiring the Clear River Property, and continuing to own the Clear River Property.

92. Banco Master has no adequate remedy at law.

93. Upon information and belief, the Clear River Property constitutes identifiable proceeds of the misappropriated funds from Banco Master and is held by Clear River Properties LLC in constructive trust for Banco Master.

94. A constructive trust on the Clear River Property is necessary so that Clear River Properties LLC will not dispose of the Clear River Property, which is due and owing to Banco Master.

95. Alternatively, in view of the diversion of the funds from Banco Master by Vorcaro and his co-conspirators, general considerations of right and justice demand that an equitable lien be placed on the Clear River Property.

WHEREFORE, the Liquidator requests that the Court impose a constructive trust on the Clear River Property in favor of Banco Master, or in the alternative, an equitable lien on the Clear River Property in favor of Liquidator on behalf of Banco Master. The Liquidator further requests any other and further relief that the Court deems just and proper.

## COUNT III

### CLAWBACK UNDER ARTICLE 130 OF THE BRAZILIAN BANKRUPTCY AND JUDICIAL REORGANIZATION LAW AND ARTICLE 34 OF LAW 6024

(Against Clear River Properties LLC regarding the Clear River Property)

96. Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

97. This is a claim under Articles 130 and 133 of the Brazilian Bankruptcy and Judicial Reorganization Law ("BBJRL") and article 34 of Law 6024.

98. Article 130 of the BBJRL provides that the acts committed with intent to harm creditors are revocable, once the fraudulent collusion between the debtor and the third party with the actual damages suffered by the bankrupt estate is proven.

99. Article 133 of the BBJRL provides that the revocatory claim referred on Art. 130 can be filed against all who participated in the act or that received payments, collateral or benefitted from the act committed with intent to defraud creditors.

100. Article 197 of Law 11.101/2005 and Article 34 of Law 6024 provides that the provisions of the BBJRL shall apply to extrajudicial liquidation, such as the Debtors' Brazilian Insolvency Proceedings, and for such purpose, the liquidator shall be deemed the equivalent to the judicial administrator.

101. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco Master to companies that were alter egos of himself and his co-conspirators.

102. Certain of the diverted funds, which included the Clear River Transfers, were used by Clear River Properties LLC to, among other things, acquire title to the Clear River Property.

103. The diversion of Banco Master's funds caused harm to the creditors of Banco Master. These creditors continue to be harmed by the Clear River Transfers and Clear River Properties LLC's continued ownership of the Clear River Property.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC, (i) setting aside the transactions made through the Clear River Transfers, (ii) disregarding the transfers to and ordering Clear River Properties LLC to return to Banco Master the funds transferred through the Intermediary Entities to Mosaic for the acquisition of the Clear River Property up to the amount for the acquisition of the Clear River Property, with the damages suffered by Banco Master, as provided by Article 135 of the BBJRL, or, in the alternative, order the return of the Clear River Property and the transfer of title, (iii) attach or levy execution upon the Clear River Property, (iv) restrain Clear River Properties LLC from disposing

of the Clear River Property, (v) requesting any other and further relief the Court deems just and proper.

**COUNT IV**

**CLAWBACK UNDER ARTICLE 130 OF THE BRAZILIAN BANKRUPTCY AND JUDICIAL REORGANIZATION LAW AND ARTICLE 34 OF LAW 6024**
(Against Goldbeach Properties LLC regarding the Goldbeach Properties)

104. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

105. This is a claim under Articles 130 and 133 of the Brazilian Bankruptcy and Judicial Reorganization Law ("BBJRL") and article 34 of Law 6024.

106. Article 130 of the BBJRL provides that the acts committed with intent to harm creditors are revocable, once the fraudulent collusion between the debtor and the third party with the actual damages suffered by the bankrupt estate is proven.

107. Article 133 of the BBJRL provides that the revocatory claim referred on Art. 130 can be filed against all who participated in the act or that received payments, collateral or benefitted from the act committed with intent to defraud creditors.

108. Article 197 of Law 11.101/2005 and Article 34 of Law 6024 provides that the provisions of the BBJRL shall apply to extrajudicial liquidation, such as the Debtors' Brazilian Insolvency Proceedings, and for such purpose, the liquidator shall be deemed the equivalent to the judicial administrator.

109. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco Master to companies that were alter egos of himself and his co-conspirators.

110. Certain of the diverted funds, which included the Goldbeach Transfers, were used by Goldbeach Properties LLC to, among other things, acquire title to the Goldbeach Properties.

111. The diversion of Banco Master's funds caused harm to the creditors of Banco Master. These creditors continue to be harmed by the Goldbeach Transfers and Goldbeach Properties LLC's continued ownership of the Goldbeach Properties.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC, (i) setting aside the transactions made through the Goldbeach Transfers, (ii) disregarding the transfers to and ordering Goldbeach Properties LLC to return to Banco Master the funds transferred through the Intermediary Entities to Mosaic for the acquisition of the Goldbeach Properties up to the amount for the acquisition of the Goldbeach Properties, with the damages suffered by Banco Master, as provided by Article 135 of the BBJRL, or, in the alternative, order the return of the Goldbeach Properties and the transfer of title, (iii) attach or levy execution upon the Goldbeach Properties, (iv) restrain Goldbeach Properties LLC from disposing of the Goldbeach Properties, (v) requesting any other and further relief the Court deems just and proper.

**COUNT V**

**UNJUST ENRICHMENT UNDER ARTICLE 884 OF THE BRAZILIAN CIVIL CODE**
(Against Clear River Properties LLC)

112. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

113. This is a claim under Article 884 of the Brazilian Civil Code, and is brought solely in the alternative to the claims against Clear River on the other counts alleged against it herein.

114. Under Article 884 and its Sole Paragraph of the Brazilian Civil Code, a person who, without cause, unjustly enriches himself to the detriment of another must compensate the

aggrieved party for all damages sustained by the aggrieved party in addition to all costs, fees and interest.

115. Clear River Properties LLC was unjustly enriched as a result of the transactions made through the Clear River Transfers. Ultimately, Clear River Properties LLC used the amount received from these transactions to acquire the Clear River Property.

116. Clear River Properties LLC benefited itself at the expense of and to the detriment of Banco Master, which, upon information and belief, transferred the funds to Clear River Properties LLC for, amongst other things, the acquisition of the Clear River Property.

117. As a direct result of Clear River Properties LLC's unjust enrichment, Banco Master and its creditors have been prejudiced in an amount of no less than the Clear River Transfers.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC for compensatory damages equal to the value of the Clear River Transfers unjustly conferred upon Clear River Properties LLC as alleged herein, pre- and post- judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper, including ordering the recovery of the Clear River Property and the transfer of title.

## COUNT VI

## UNJUST ENRICHMENT UNDER ARTICLE 884 OF THE BRAZILIAN CIVIL CODE

(Against Goldbeach Properties LLC)

118. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

119. This is a claim under Article 884 of the Brazilian Civil Code, and is brought solely in the alternative to the claims against Goldbeach on the other counts alleged against it herein.

120. Under Article 884 and its Sole Paragraph of the Brazilian Civil Code, a person who, without cause, unjustly enriches himself to the detriment of another must compensate the aggrieved party for all damages sustained by the aggrieved party in addition to all costs, fees and interest.

121. Goldbeach Properties LLC was unjustly enriched as a result of the transactions made through the Goldbeach Transfers. Ultimately, Goldbeach Properties LLC used the amount received from these transactions to acquire the Goldbeach Properties.

122. Goldbeach Properties LLC benefited itself at the expense of and to the detriment of Banco Master, which, upon information and belief, transferred the funds to Goldbeach Properties LLC for, amongst other things, the acquisition of the Goldbeach Properties.

123. As a direct result of Goldbeach Properties LLC's unjust enrichment, Banco Master and its creditors have been prejudiced in an amount of no less than the Goldbeach Transfers.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC for compensatory damages equal to the value of the Goldbeach Transfers unjustly conferred upon Goldbeach Properties LLC as alleged herein, pre- and post-judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper, including ordering the recovery of the Goldbeach Properties and the transfer of title.

## COUNT VII

### FRAUDULENT TRANSFER UNDER FLA. STAT. § 726.105(1)(a)

(Against Goldbeach Properties LLC regarding the acquisition of the Goldbeach Properties)

124. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

125. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco Master to companies that were alter egos of Vorcaro and/or his co-conspirators, as more specifically set forth herein.

126. As a result of the foregoing, Banco Master has a claim against, and at all relevant times was a creditor of, each of the Intermediary Entities, including Mosaic Group, that received funds diverted from Banco Master, which ultimately resulted in the Goldbeach Transfers.

127. Upon information and belief, some or all of the funds transferred for the purchase of the Goldbeach Properties came from funds improperly transferred from Banco Master.

128. The Goldbeach Transfers were made with the actual intent to hinder, delay, or defraud Banco Master and its creditors, including to remove and conceal dissipated assets and to conceal the beneficial interests of Vorcaro in the Goldbeach Properties.

WHEREFORE, Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC, (i) for damages in the full amount of the Goldbeach Transfers and any additional funds transferred in connection with the Goldbeach Properties, plus pre- and post-judgment interest, attorneys' fees, and costs, (ii) attaching or levying execution upon the Goldbeach Properties, (iii) enjoining Goldbeach Properties LLC from taking any action to dispose of the Goldbeach Properties, (iv) appointing a receiver to take charge of the Goldbeach Properties and/or any other property of the Goldbeach Properties LLC and (v) requesting any other and further relief the Court deems just and proper.

## COUNT VIII

### FRAUDULENT TRANSFER UNDER FLA. STAT. § 726.105(1)(b)

(Against Goldbeach Properties LLC regarding the acquisition of the Goldbeach Properties)

129. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

130. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco Master to companies that were alter egos of Vorcaro and/or his co-conspirators, as more specifically set forth herein.

131. As a result of the foregoing, Banco Master has a claim against, and at all relevant times was a creditor of, each of the Intermediary Entities, including Mosaic Group, that received funds diverted from Banco Master, which ultimately resulted in the Goldbeach Transfers.

132. Upon information and belief, as previously explained in greater detail, Vorcaro and his co-conspirators, transferred funds to Mosaic Group for the acquisition of the Goldbeach Properties on behalf of Goldbeach Properties LLC.

133. Upon information and belief, some or all of the funds transferred for the purchase of the Goldbeach Properties came from funds improperly transferred from Banco Master.

134. Upon information and belief, Mosaic Group and any other Intermediary Entities involved in the Goldbeach Transfers, as more specifically set forth herein, were insolvent at the time of the Goldbeach Transfers, as they had no assets that were not improperly dissipated from Banco Master and as such were at all times subject to claims greater than all of their assets, and such transferors (which at all times were debtors of the estate) did not receive reasonably equivalent value for the Goldbeach Transfers, which were made to or for the benefit of Defendant Goldbeach pursuant to sham transactions which were not intended to be performed by any party and provided no value to any transferor.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC, (i) for damages in the full amount of the Goldbeach Transfers, plus pre- and post-judgment interest, attorneys' fees, and costs, (ii) attaching or levying execution upon the Goldbeach Properties, (iii) enjoining Goldbeach Properties LLC from taking any action

to dispose of the Goldbeach Properties, (iv) appointing a receiver to take charge of the Goldbeach Properties and/or any other property of Goldbeach Properties LLC and (v) requesting any other and further relief the Court deems just and proper.

## COUNT IX

### UNJUST ENRICHMENT UNDER FLORIDA LAW
(Against Goldbeach Properties LLC)

135. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

136. Vorcaro and his co-conspirators, through the Intermediary Entities caused Goldbeach Properties LLC to receive and/or benefit from the funds illicitly transferred pursuant to the Goldbeach Transfers , which were used to, among other things, acquire title to the Goldbeach Properties. Banco Master received no value on account of the illegal dissipation of its funds, which were ultimately transferred to or for Goldbeach's benefit pursuant to the Goldbeach Transfers.

137. By receiving and/or directly benefitting from the Goldbeach Transfers, Goldbeach Properties LLC was enriched at the expense of Banco Master.

138. The benefit conferred upon Goldbeach was at the expense of Banco Master and to its detriment in that Banco Master has been deprived of the possession and use of its funds to which it is entitled.

139. By accepting the benefit of and the funds derived from Goldbeach Transfer, Defendant Goldbeach was aware of the benefit conferred upon it and continued to retain that benefit under circumstances that make its retention inequitable.

140. Goldbeach knew or should have known that it had no entitlement to the benefit conferred upon them by Banco Master as a result of the Goldbeach Transfers.

141. Goldbeach Properties LLC knew or should have known that the benefit it received was at the expense of Banco Master.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC for compensatory damages equal to the value of the Goldbeach Transfers, the benefit unjustly conferred upon Goldbeach Properties LLC as alleged herein, pre- and post- judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper, including ordering the recovery of Goldbeach Properties and the transfer of title.

**COUNT X**

**FRAUDULENT TRANSFER UNDER COLO. REV. STAT. § 38-8-105(1)(a)**
(Against Clear River Properties LLC regarding the acquisition of the Clear River Property)

142. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

143. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco to companies that were alter egos of Vorcaro and/or his co-conspirators, as more specifically set forth herein.

144. As a result of the foregoing, Banco Master has a claim against, and at all relevant times was a creditor of, each of the Intermediary Entities, including Mosaic Group, that received funds diverted from Banco Master, which ultimately resulted in the Clear River Transfers..

145. Upon information and belief, some or all of the funds transferred for the purchase of the Clear River Property came from funds improperly transferred from Banco Master.

146. The Clear River Transfers were made with the actual intent to hinder, delay, or defraud Banco Master and its creditors, including to remove and conceal dissipated assets and to conceal the beneficial interests of Vorcaro in the Clear River Property.

WHEREFORE, Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC, (i) for damages in the full amount of the Goldbeach Transfers and any additional funds transferred in connection with the acquisition of the Clear River Property, plus pre- and post-judgment interest, attorneys' fees, and costs, (ii) attaching or levying execution upon the Clear River Property, (iii) enjoining Clear River Properties LLC from taking any action to dispose of the Clear River Property, (iv) appointing a receiver to take charge of the Clear River Property and/or any other property of the Clear River Properties LLC and (v) requesting any other and further relief the Court deems just and proper.

## COUNT XI

### FRAUDULENT TRANSFER UNDER COLO. REV. STAT. § 38-8-105(1)(b)

(Against Clear River Properties LLC regarding the acquisition of the Clear River Property)

147. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

148. Banco Master, through its former President and majority shareholder, Vorcaro, diverted funds from Banco Master to companies that were alter egos of Vorcaro and/or his co-conspirators, as more specifically set forth herein.

149. As a result of the foregoing, Banco Master has a claim against, and at all relevant times was a creditor of, each of the Intermediary Entities, including Mosaic Group, that received funds diverted from Banco Master, which ultimately resulted in the Clear River Transfers.

150. Upon information and belief, as previously explained in greater detail, Vorcaro and his co-conspirators, transferred funds to Mosaic Group for the acquisition of the Clear River Property on behalf of Defendant Clear River.

151. Upon information and belief, some or all of the funds transferred for the purchase of the Clear River Property came from funds improperly transferred from Banco Master.

152. Upon information and belief, Mosaic Group and any other Intermediary Entities involved in the Clear River Transfers, as more specifically set forth herein, were insolvent at the time of the Clear River Transfers, as they had no assets that were not improperly dissipated from Banco Master and as such were at all times subject to claims greater than all of their assets, and such transferors (which at all times were debtors of the estate) did not receive reasonably equivalent value for the Clear River Transfers, which were made to or for the benefit of Defendant Clear River pursuant to sham transactions which were not intended to be performed by any party and provided no value to any transferor.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC, (i) for damages in the full amount of the Clear River Transfers, plus pre- and post-judgment interest, attorneys' fees, and costs, (ii) attaching or levying execution upon the Clear River Property, (iii) enjoining Clear River Properties LLC from taking any action to dispose of the Clear River Property, (iv) appointing a receiver to take charge of the Clear River Property and/or any other property of Clear River Properties LLC and (v) requesting any other and further relief the Court deems just and proper.

## COUNT XII

**UNJUST ENRICHMENT UNDER COLORADO LAW**
(Against Clear River Properties LLC)

153. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

154. Vorcaro and his co-conspirators, through the Intermediary Entities caused Clear River to receive and/or benefit from the funds illicitly transferred pursuant to the Clear River Transfers , which were used to, among other things, acquire title to the Clear River Property. Banco

Master received no value on account of the illegal dissipation of its funds, which were ultimately transferred to or for Clear River's benefit pursuant to the Clear River Transfers.

155. By receiving and/or directly benefitting from the Clear River Transfers, Clear River was enriched at the expense of Banco Master.

156. The benefit conferred upon Clear River was at the expense of Banco Master and to its detriment in that Banco Master has been deprived of the possession and use of its funds to which it is entitled.

157. By accepting the benefit of and the funds derived from Clear River Transfers, Defendant Clear River was aware of the benefit conferred upon it and continued to retain that benefit under circumstances that make its retention inequitable.

158. Clear River knew or should have known that it had no entitlement to the benefit conferred upon them by Banco Master as a result of the Clear River Transfers.

159. Clear River knew or should have known that the benefit it received was at the expense of Banco Master.

WHEREFORE, the Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC for compensatory damages equal to the value of the Clear River Transfers, the benefit unjustly conferred upon Clear River Properties LLC as alleged herein, pre- and post- judgment interest, attorney's fees and costs if appropriate, and any further and other relief that the Court deems just and proper, including ordering the recovery of the Clear River Property and the transfer of title.

## COUNT XIII

## CLAWBACK UNDER ARTICLES 129 AND 136 OF THE BRAZILIAN BANKRUPTCY AND JUDICIAL REORGANIZATION LAW AND ARTICLES 34 AND 35 OF LAW 6024

**(Against Clear River Properties LLC Regarding the Clear River Property)**

160. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

161. This is a claim for a declaration of ineffectiveness and restitution under Articles 129(IV) and 136 of the Brazilian Bankruptcy and Judicial Reorganization Law, Law No. 11,101/2005 ("BBJRL"), as applicable to Banco Master's extrajudicial liquidation pursuant to Article 197 of the BBJRL and Articles 34 and 35 of Law No. 6,024/1974.

162. Under those provisions, the BBJRL applies on a supplementary basis to extrajudicial liquidation, insofar as consistent with its governing legislation, and the Liquidator is entitled to challenge dispositions of Banco Master's assets for the benefit of its liquidation estate.

163. Article 129(IV) renders gratuitous dispositions made within the two years preceding bankruptcy ineffective against the estate, irrespective of the debtor's intent to defraud creditors or the counterparty's knowledge of the debtor's financial distress. Its sole paragraph permits a separate action seeking that declaration.

164. BACEN ordered Banco Master's extrajudicial liquidation on November 18, 2025. Accordingly, the two-year period applicable to this Count extends from November 18, 2023, to the commencement of Banco Master's extrajudicial liquidation on November 18, 2025.

165. Upon information and belief, during that period, Banco Master, acting through Vorcaro and/or his co-conspirators, made or caused to be made the dispositions of its funds identified as the Clear River Transfers which were ultimately received by or applied for the benefit of Clear River Properties LLC, including for the acquisition of the Clear River Property.

166. Upon information and belief, the proceeds of the Clear River Transfers were routed through the Intermediary Entities identified herein including the Mosaic Group, and thereafter transferred to or for the benefit of Clear River Properties LLC, including for the acquisition of the Clear River Property. Those proceeds funded the acquisition of, improvements to, and other expenditures relating to the Clear River Property.

167. The Clear River Transfers were therefore gratuitous dispositions. Banco Master received no genuine consideration in exchange for the Clear River Transfers, whether from their immediate recipients or from any other participant in the transactions. Any purported investment, loan, asset acquisition, or other consideration invoked to justify the Clear River Transfers did not confer a genuine corresponding asset, right, or economic benefit on Banco Master.

168. Clear River Properties LLC was a participant in and intended beneficiary of funds wrongfully excised from Banco Master which upon information and belief, flowed through the Intermediary Entities and ultimately led to the Clear River Transfers, rather than an independent purchaser of Banco Master's funds. As stated above, Clear River Properties LLC was formed to acquire real property for Vorcaro's personal benefit, and the changes to its management and ownership were coordinated with the acquisition of the Clear River Property. Upon information and belief, the Intermediary Entities, including Mosaic Short Duration Fund, and Mosaic Group implemented the dispositions for that purpose, and Clear River Properties LLC accepted and retained their proceeds through the acquisition and improvement of the Clear River Property.

169. Because the Clear River Transfers were gratuitous dispositions made within the applicable two-year period, they are ineffective against Banco Master's liquidation estate under Article 129(IV) of the BBJRL. Clear River Properties LLC is required to account for and restore

the proceeds it received or that were applied for its benefit as a participant in and beneficiary of those dispositions.

170. Article 136 of the BBJRL provides for restoration of the parties to their prior position upon a declaration of ineffectiveness. The Liquidator accordingly seeks restitution from Clear River Properties LLC of the proceeds attributable to the Clear River Transfers, together with appropriate relief against their identifiable proceeds.

**WHEREFORE**, the Liquidator requests that the Court enter judgment in its favor and against Clear River Properties LLC, (i) declaring the Clear River Transfers ineffective under Article 129(IV) of the BBJRL; (ii) ordering Clear River Properties LLC to restore to the Liquidator, for the benefit of Banco Master's liquidation estate, the proceeds of the Clear River Transfers , in an amount of no less than $77,000,000; (iii) granting appropriate relief against the Clear River Property, including the imposition of a constructive trust and/or equitable-lien on that property; (iv) restraining Clear River Properties LLC from transferring, encumbering, or otherwise disposing of the Clear River Property or other identifiable proceeds, as authorized by applicable law; (v) awarding interest and costs to the extent permitted by applicable law, and (vi) any other and further relief the Court deems just and proper.

## COUNT XIV

## CLAWBACK UNDER ARTICLES 129 AND 136 OF THE BRAZILIAN BANKRUPTCY AND JUDICIAL REORGANIZATION LAW AND ARTICLES 34 AND 35 OF LAW 6024

**(Against Goldbeach Properties LLC Regarding the Goldbeach Properties)**

171. The Liquidator re-alleges and incorporates paragraphs 1 through 75 above as though set forth fully herein.

172. This is a claim for a declaration of ineffectiveness and restitution under Articles 129(IV) and 136 of the Brazilian Bankruptcy and Judicial Reorganization Law, Law No. 11,101/2005 ("BBJRL"), as applicable to Banco Master's extrajudicial liquidation pursuant to Article 197 of the BBJRL and Articles 34 and 35 of Law No. 6,024/1974.

173. Under those provisions, the BBJRL applies on a supplementary basis to extrajudicial liquidation, insofar as consistent with its governing legislation, and the Liquidator is entitled to challenge dispositions of Banco Master's assets for the benefit of its liquidation estate.

174. Article 129(IV) renders gratuitous dispositions made within the two years preceding bankruptcy ineffective against the estate, irrespective of the debtor's intent to defraud creditors or the counterparty's knowledge of the debtor's financial distress. Its sole paragraph permits a separate action seeking that declaration.

175. BACEN ordered Banco Master's extrajudicial liquidation on November 18, 2025. Accordingly, the two-year period applicable to this Count extends from November 18, 2023, to the commencement of Banco Master's extrajudicial liquidation on November 18, 2025.

176. Upon information and belief, during that period, Banco Master, acting through Vorcaro and/or his co-conspirators, made or caused to be made the dispositions of its funds identified as the Goldbeach Transfers which were ultimately received by or applied for the benefit of Goldbeach Properties LLC, including for the acquisition of the Goldbeach Properties.

177. Upon information and belief, the proceeds of the Goldbeach Transfers were routed through the Intermediary Entities identified herein including the Mosaic Group, and thereafter transferred to or for the benefit of Goldbeach Properties LLC, including for the acquisition of the

Goldbeach Properties. Those proceeds funded the acquisition of, improvements to, and other expenditures relating to the Goldbeach Properties

178. The Goldbeach Transfers were therefore gratuitous dispositions. Banco Master received no genuine consideration in exchange for the Goldbeach Transfers, whether from their immediate recipients or from any other participant in the transactions. Any purported investment, loan, asset acquisition, or other consideration invoked to justify the Goldbeach Transfers did not confer a genuine corresponding asset, right, or economic benefit on Banco Master.

179. Goldbeach Properties LLC was a participant in and intended beneficiary of funds wrongfully excised from Banco Master which upon information and belief, flowed through the Intermediary Entities and ultimately led to the Goldbeach Transfers, rather than an independent purchaser of Banco Master's funds. As stated above Goldbeach Properties LLC was formed to acquire real property for Vorcaro's personal benefit, and the changes to its management and ownership were coordinated with the acquisition of the Goldbeach Properties. Upon information and belief, the Intermediary Entities, including the Mosaic Short Duration Fund and Mosaic Group implemented the dispositions for that purpose, and Goldbeach Properties LLC accepted and retained their proceeds through the acquisition and improvement of the Goldbeach Properties.

180. Because the Goldbeach Transfers were gratuitous dispositions made within the applicable two-year period, they are ineffective against Banco Master's liquidation estate under Article 129(IV) of the BBJRL. Goldbeach Properties LLC is required to account for and restore the proceeds it received or that were applied for its benefit as a participant in and beneficiary of those dispositions.

181. Article 136 of the BBJRL provides for restoration of the parties to their prior position upon a declaration of ineffectiveness. The Liquidator accordingly seeks restitution from Goldbeach Properties LLC of the proceeds attributable to the Goldbeach Transfers, together with appropriate relief against their identifiable proceeds.

**WHEREFORE**, the Liquidator requests that the Court enter judgment in its favor and against Goldbeach Properties LLC, (i) declaring the Goldbeach Transfers ineffective under Article 129(IV) of the BBJRL; (ii) ordering Goldbeach Properties LLC to restore to the Liquidator, for the benefit of Banco Master's liquidation estate, the proceeds of the Goldbeach Transfers , in an amount of no less than $92,500,000; (iii) granting appropriate relief against the Goldbeach Properties, including the imposition of a constructive-trust and/or equitable-lien relief on those properties; (iv) restraining Goldbeach Properties LLC from transferring, encumbering, or otherwise disposing of the Goldbeach Properties or other identifiable proceeds, as authorized by applicable law; (v) awarding interest and costs to the extent permitted by applicable law and (vi) any other and further relief the Court deems just and proper.

Dated: October 7, 2026

Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
edavis@sequorlaw.com
fmenendez@sequorlaw.com
jmendoza@sequorlaw.com
mhanlon@sequorlaw.com
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

By: */s/ Fernando J. Menendez*
Edward H. Davis
Florida Bar No.: 704539
Fernando J. Menendez
Florida Bar No.: 18167
Juan J. Mendoza

Florida Bar No.: 113587
Michael D. Hanlon
Florida Bar No.: 1068478